CEMAR, INC., t/a Rising Sun Motors, Plaintiff,

v.

NISSAN MOTOR CORPORATION IN U.S.A., Defendant.

NISSAN MOTOR CORPORATION IN U.S.A., Counter–Plaintiff,

v.

CEMAR, INC., t/a Rising Sun Motors,

and

William T. Murray, Counter–Defendants.

Civ. A. No. 87–165–CMW.

United States District Court, D. Delaware.

Jan. 29, 1988.

Kenneth W. Lewis, of Daley & Lewis, Newark, Del., of counsel: David F. Albright, Franklin T. Caudill, and Paul J. Cohen, of Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff and counter-defendants.

Robert K. Payson, of Potter, Anderson & Corroon, Wilmington, Del., of counsel: Reed E. Hundt, and Eric A. Stern, of Latham & Watkins, Washington, D.C., for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This action is a motion to dismiss arising out of a suit filed by an automobile dealer against its supplier. Cemar, Inc., the plaintiff, alleges that the defendant, Nissan Motor Corporation in U.S.A., engaged in a pattern of conduct to discriminate against it with respect to the processing, handling, and sale of motor vehicles and parts, and to eventually replace it with a more favored dealer. Cemar seeks damages under the Dealer's Day in Court Act, the Sherman Act, the Robinson–Patman Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Maryland Transportation Code, and common law theories of fraud, negligent misrepresentation and breach of contract. Nissan Motor Corporation in U.S.A., in turn, counterclaims against Cemar, Inc., and William T. Murray, the president and principal shareholder of Cemar, Inc.

The suit was originally filed in the District of Maryland on June 28, 1985. On September 20, 1985, the defendant filed a Motion to Dismiss the counts under the Sherman Act, the Robinson–Patman Act, and RICO. The case was transferred to this Court on April 1, 1987, with this motion pending. The parties have since updated their briefs and reargued the Motion before this Court.

## I. FACTS ALLEGED BY CEMAR

Because this action is a motion to dismiss, the facts alleged by Cemar in its complaint will be taken as true for the purpose of deciding the motion. *Hospital Bldg. Co. v. Rex Hospital Trustees,* 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976). Plaintiff, Cemar, Inc., t/a Rising Sun Motors ("Cemar"), is a Delaware corporation which, at the time of the activities in question, operated an automobile dealership in Rising Sun, Maryland. Defendant, Nissan Motor Corporation in U.S.A. ("Nissan"), is a California corporation owned and controlled by Nissan Motor Corp., Ltd., a Japanese corporation. Cemar became an authorized dealer in August 1974, and it operated under "Datsun Dealer Sales and Service Agreements" until it sold its dealership on May 6, 1983. Cemar alleges that Nissan discriminated against it while it was a dealer and conspired with Aubrey J. Cox, Tillman B. Cox, Cox Enterprises, Inc., and Tim Cox Enterprises, Inc. ("the Coxes"), and possibly others, to replace Cemar with the Coxes as an authorized Nissan dealer.

Cemar alleges that Nissan discriminated against it with respect to the delivery and allocation of vehicles and parts by making them more readily available to other dealers and on more favorable terms. Nissan

allegedly allotted Cemar a disproportionately large number of unpopular vehicles, which Cemar did not desire and which were difficult to sell for a profit, in comparison to what Nissan allotted to other similarly situated dealers. Nissan then coerced Cemar into buying the unpopular vehicles by refusing to sell Cemar popular vehicles without its also buying the unpopular ones. Under Nissan's "Equitable Distribution System", dealers' potential sales are supposed to be considered when allocating vehicles. Cemar alleges that Nissan ignored this system and instead allocated new vehicles to dealers based on past sales, the "travel rate". Cemar's sales were lower than other dealers due to its receiving a higher percentage of unpopular vehicles. This lower travel rate caused Cemar to continue to receive high proportions of unpopular vehicles. Nissan "compounded" this problem by delaying shipments to Cemar in order to further decrease Cemar's travel rate, and by knowingly using false Retail Delivery Reporting Cards submitted by other dealers in calculating their travel rates. With respect to the sale of parts, Cemar alleges discriminatory delivery and allocation practices. In addition, it claims that Nissan discriminated against it with respect to credit terms, requiring it to accept parts C.O.D. while allowing other dealers to maintain open accounts.

Cemar claims that the cause of the discrimination was that Nissan had personal antipathy towards it and had developed friendships with other dealers. It also alleges that other dealers used bribes, kickbacks, and other improper incentives in order to gain favorable treatment. Cemar refused to engage in such improper activities and, at the same time, sought a better location and fairer allocation. Consequently, Nissan treated it unfavorably.

Cemar alleges that Nissan's ultimate goal was to eliminate it as a dealer and replace it with the Coxes. Nissan carried this plan out with the consent and collaboration of the Coxes. Cemar desired to move to a potentially more lucrative location. Nissan led Cemar to believe that it approved of the move and would grant Cemar another franchise in perpetuity. However, after the deal was consummated and Cemar had moved from its old location and invested a substantial amount of money in the new location, Nissan informed Cemar that it would offer Cemar only a one-year franchise agreement, in breach of Cemar's understanding of the terms of its move. Cemar had no choice but to sign the agreement. The one-year agreement and Nissan's discriminatory practices created pressure for Cemar to sell its franchise. However, Nissan informed Cemar that the only dealer it would approve for that location was the Coxes, and it threatened not to renew the franchise agreement unless Cemar sold the dealership to the Coxes.

Cemar claims that Nissan engaged in several improper activities concerning the sale in additon to Nissan's discriminating against Cemar, conspiring with the Coxes, and using coercive methods. Nissan "transmitted" a false written notice to the Maryland Motor Vehicles Administration stating that Cemar was no longer a dealer and had already sold the franchise to the Coxes. This was done prior to the approval of the Coxes as a dealer and was allegedly designed to make it illegal for Cemar to sell vehicles in the future. Nissan made similar statements to other dealers. Nissan also gave confidential business information concerning Cemar to the Coxes that enabled them to obtain an advantage in negotiating with Cemar. The Coxes in turn disrupted employee relations at Cemar and bribed Cemar employees. Cemar finally sold the franchise to the Coxes and leased certain property to them with a purchase option on May 6, 1983. Cemar alleges that this sale and lease were at prices lower than what it could have obtained in a market free of improper behavior.

## II. MOTION TO DISMISS

Rule 12(b)(6) states that a motion to dismiss can be granted for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The Court can dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Conley v. Gib-*

*son*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). To decide whether to grant Nissan's motion, the Court must take Cemar's allegations as true and draw any reasonable inferences in favor of Cemar.

Cemar is required only to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). A more liberal standard is often applied to antitrust pleadings. 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1228 (1969) [hereinafter "Wright & Miller"]. Thus, "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' ... dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co.*, 425 U.S. at 746, 96 S.Ct. at 1853 (citation omitted). Cemar is required to plead "enough data [so that] the elements of the claim for relief can be identified." 5 Wright & Miller, *supra* § 1228. The elements of each claim will be described in the discussion of each count.

## III. COUNT II—CONCERTED REFUSAL TO DEAL

In Count II, Cemar incorporates the facts described above and claims that "Defendant contracted, combined, and conspired with the Coxes, *competitors of Plaintiff*, to terminate the Plaintiff's franchise, and to perform numerous acts of discrimination and bad faith, coercion, and intimidation in order to accomplish said termination, all of which constitutes a concerted refusal to deal in *per se* violation of [the Sherman Act,] 15 U.S.C. § 1." Complaint ¶ 24 (emphasis added). Cemar then alleges that *it* suffered damages including lost profits and business opportunities "as a result of the acts complained of." Complaint ¶ 25. Nissan argues that its activities do not rise to the level of a *per se* violation and that Cemar cannot succeed under a rule of reason inquiry because it has not alleged "antitrust injury."

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1 (1982). However, "[b]ecause almost all business agreements may be interpreted as restraining trade to some degree, § 1 of the Sherman Act has been construed for the most part to proscribe only those combinations that 'unduly' restrain trade." *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 (3d Cir.1979). Therefore, courts usually apply a "rule of reason" and examine the anticompetitive effects of the challenged activity. *Malley–Duff & Assoc. v. Crown Life Ins. Co.*, 734 F.2d 133, 139 (3d Cir.1984), *cert. denied sub nom. Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984). However, the courts have developed a list of activities "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). These *per se* violations are made out solely by alleging the conduct. No "public injury" or anticompetitive effects need be specifically alleged because the courts assume that activities falling within *per se* categories have an anticompetitive effect. *See, e.g., Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 660, 81 S.Ct. 365, 367, 5 L.Ed.2d 358 (1961) (need only allege a violation and that plaintiff was damaged by it).

The Supreme Court has held that certain group boycotts are *per se* violations of the Sherman Act. *See United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's Inc. v. Broadway Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Even though concerted refusals to deal are a form of group boycott, courts have not accepted "the notion that all concerted refusals to deal fall automatically as *per se* violations of the antitrust laws." *Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr. Trades Council*, 670 F.2d 421, 429 (3d Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982). Thus, "[a] plaintiff seeking application of the *per*

*se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 298, 105 S.Ct. 2613, 2621, 86 L.Ed.2d 202 (1985). Although the Third Circuit has not addressed this issue since the Supreme Court's decision in the *Northwest Wholesale* case, it has previously stated that it has "attempted to limit the application of the *per se* rule to the 'classic' boycott." *Larry V. Muko*, 670 F.2d at 430. Thus, a concerted activity is a *per se* group boycott if the "purpose is to" exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both." *De Filippo v. Ford Motor Co.*, 516 F.2d 1313, 1318 (3d Cir.) (action by manufacturer and dealers that denied special terms to plaintiff but did not deny the opportunity to be a Ford dealer was not a *per se* violation) (citation omitted), *cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975).

### A. Per Se Analysis

■ Cemar alleges that Nissan conspired with the Coxes to eliminate it as a Nissan dealer and replace it with the Coxes by coercing it to sell its franchise to the Coxes. The Coxes are not parties to this suit. This forced sale of the franchise situation is analogous to the situation where a supplier terminates a franchise. Such a "vertical" restraint is not usually subject to *per se* rules because manufacturers are given wide latitude with marketing decisions concerning exclusive dealerships. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977) (vertical non-price restrictions are subject to the rule of reason); *see also Tunis Bros. Co. v. Ford Motor Co.*, 763 F.2d 1482, 1497 (3d Cir.1985) (distinguishing horizontal and vertical restraints), *vacated,* 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986) (consideration of new precedent), *aff'd. on re-*

*mand,* 823 F.2d 49 (3d Cir.1987). On the other hand, the Supreme Court has concluded that the horizontal nature of a conspiracy between existing dealers and a manufacturer to pressure a discounter has the requisite anticompetitive effects to be a *per se* violation. *General Motors,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415.

■ Some actions by suppliers against dealers have sufficient anticompetitive effects to be *per se* violations. Thus,

> although a unilateral decision to refuse to deal is not in and of itself a violation of the antitrust laws, if the decision is not purely unilateral but is the product of *competitors* working in concert with themselves or in conjunction with the company to exclude a person or group from the market, the necessary elements of a boycott in the classical sense may be present, and hence a § 1 violation may be made out.

*Malley–Duff,* 734 F.2d at 133 (emphasis added); *cf. Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761–64, 104 S.Ct. 1464, 1469–71, 79 L.Ed.2d 775 (1984) (Because a manufacturer can deal or refuse to deal with whomever it likes if it does so independently, a terminated distributor must produce evidence which "tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently."). Thus, although dealer substitution in response to complaints, or at the suggestion of another dealer, is not *per se* illegal, *A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1306 (9th Cir.1981), it may be *per se* illegal if the decision was prompted by dealer coercion. *Id.* at n. 3 (citing *Cernuto,* 595 F.2d 164).

Cemar relies on *Cernuto,* 595 F.2d 164, to support its argument that the conduct it alleges constitutes a *per se* violation. In *Cernuto,* a former distributor sued another distributor and the manufacturer because of its termination at the urging of the other distributor. The court stated that "when a marketing decision, although ostensibly taken by a manufacturer, is in fact the result of pressure from another customer, such a decision must be scrutinized more closely than solely unilateral action might

be." *Id.* at 168. The court held that the facts alleged by plaintiff could make out a *per se* violation. Judge Adams reasoned that "if the action of a manufacturer or other supplier is taken *at the direction of its customer,* the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its *competition* by utilizing the power of a *common supplier.*" *Id.* (emphasis ·added).

Later cases have applied this concept and held that concerted activities between *competing distributors* and a manufacturer or supplier may be *per se* unlawful. For example, in *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105 (3d Cir.), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), Sweeney alleged that his hauling allowance as a Texaco dealer had been reduced because of complaints from competing distributors that he had been undercutting their prices. The court held that Sweeney had sufficiently alleged a *per se* violation, but had not presented sufficient evidence of a conspiracy. Likewise, in *Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469 (3d Cir.1985), plaintiff alleged that its distributors and a competitor conspired to refuse to deal with it in order to restrain price competition by forcing it out of the market. The court held that Fragale did allege a *per se* violation. In *Malley–Duff,* 734 F.2d 133, the court held that there was sufficient evidence of a group boycott by plaintiff's insurance competitors to submit the case to a jury on a *per se* theory. Finally, in *Tunis Bros,* 763 F.2d 1482, a competing Ford dealer allegedly conspired with Ford to eliminate the plaintiff's franchise by terminating it and rejecting its credit applications. Judge Higginbotham stated that the "key element" in maintaining the case under a *per se* theory was "simply probative evidence of some form of collusion between a supplier and a *competing distributor* which interjects horizontal conflict." *Id.* at 1498 (emphasis added).

The common element in all of these cases is that the plaintiffs alleged concerted activities between *competitors* and suppliers or manufacturers to accomplish *anticompetitive results.* All of them involved alleged conspiracies where *existing competitors* influenced the decision of their common supplier, and each case fits into a known category of *per se* violations. In *Malley–Duff,* there was a group boycott where several competitors sought to oust a competitor, thus reducing the number of competitors and competition in the market. Similarly, in *Tunis Bros.,* a competitor sought to expand its geographic territory and reduce competition by eliminating the plaintiff's franchise. Finally, *Cernuto, General Motors,* and *Sweeney* each involved ·resale price maintenance or other price restraints. In his *Cernuto* opinion, Judge Adams emphasized the "pre-eminence of price considerations in antitrust law," and the centrality of price maintenance to the court's decision that a *per se* rule applied. *Cernuto,* 595 F.2d at 168–69. Cemar has alleged no price restraint, territorial restriction, or group boycott.

Cemar alleges that Nissan "collaborated" with the Coxes in an effort to replace its franchise with the Coxes and that they conspired to coerce Cemar into selling to the Coxes. It alleges that Nissan collaborated with the Coxes, rather than acting independently, by revealing confidential information to the Coxes and coercing Cemar to sell only to the Coxes. These allegations are insufficient to make out a *per se* violation of section 1.

The first problem is that Cemar does not allege that the Coxes were Nissan dealers at the time of the activities in question. Although Cemar stated in Count II that the Coxes were "competitors of the plaintiff," Complaint ¶ 24, nowhere in the facts or description of the parties did Cemar allege that the Coxes were Nissan dealers. In fact, Cemar alleged to the contrary when it claimed that Nissan falsely advised the State "prior to the approval of the Coxes as a dealer." Complaint ¶ 19(b).

The pernicious effect on competition in the *Cernuto* line of cases is that existing competitors conspire to eliminate another competitor, thus reducing their competition and creating a horizontal restraint. Cemar has instead alleged a dealer substitution between it and the Coxes, thus leaving the

same number of Nissan dealers and not adversely affecting competition. *A.H. Cox & Co.*, 653 F.2d 1307. Even under the liberal standard of a motion to dismiss, the Court cannot infer from the pleadings that the Coxes were Nissan dealers in competition with Cemar. As such, the horizontal element of restraint referred to in *Cernuto* is not present here.

The Court recognizes that Cemar has alleged concerted activity to coerce Cemar into selling its franchise at below-market value. This may well be improper, but it is not a *per se* violation of section 1. Taking all allegations as true, and drawing all inferences in favor of Cemar, the Court finds that Cemar has not alleged the facts necessary to turn a dealer substitution or termination into a restraint in *per se* violation of the Sherman Act. Because Cemar has not alleged a claim upon which relief can be granted, Count II must be dismissed.

#### B. Rule of Reason Analysis

■ In most cases, if the plaintiff's allegations do not meet the standard for a *per se* violation, the facts are evaluated under the rule of reason. Under that rule, Cemar would have to show "that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets." *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). Cemar limited its allegations to a *per se* violation of section 1. Complaint ¶ 24. Even if it had alleged a violation under the rule of reason, however, the claim would be dismissed.

Cemar's rule of reason claim would fail because Cemar alleges injury only to itself, not to competition. A rule of reason inquiry consists of examining the anticompetitive effects of an alleged restraint. *Glauser*, 570 F.2d at 81. Thus, to succeed, Cemar must allege the actual anticompetitive impact of the alleged conspiracy.

It is also well established that the antitrust laws protect competition, not individual competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Thus, Cemar must allege "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent." *Id.* at 489, 97 S.Ct. at 697 (emphasis in original). Cemar has failed to do this. Although injury to an individual competitor can sometimes injure competition, Cemar has not alleged such an injury. Cemar simply alleges a case of improper dealer substitution. Although it is necessary that one dealer be injured in such a situation, there is usually no anticompetitive effect. *A.H. Cox & Co.*, 653 F.2d at 1307. Therefore, because Cemar did not allege any anticompetitive effect and the Court cannot reasonably infer one, Cemar has not sufficiently alleged a section 1 violation under the rule of reason and Nissan's Motion to Dismiss Count II must be granted.

### IV. COUNT III—TYING

Cemar alleges that Nissan "utilized its total control of the allocation of scarce and unique popular Datsun vehicles, in order to force plaintiff, as a condition of receiving said vehicles, to accept delivery of unpopular vehicles which plaintiff did not order or desire, all of which constituted a tie-in in violation of [the Sherman Act,] 15 U.S.C. § 1." Complaint ¶ 27. It further alleges that this activity caused it severe damages, including "loss of profits and business opportunities." Complaint ¶ 28. Nissan argues that Cemar has not alleged the necessary elements for a tying claim under the Sherman Act.

A tie-in is an "agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchase a different (or tied) product." *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). "[T]he vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another." *Id.* at 11, 78 S.Ct. at 521. Although section 3 of the Clayton Act specifically deals with tying, many cases do not meet the Clayton Act's jurisdictional requirements. Thus, courts also analyze tying claims under the Sherman Act's pro-

hibition of contracts "in restraint of trade or commerce." *See, e.g., id.* at 1, 78 S.Ct. at 515.

### A. Per Se Violations

■ The Supreme Court has held that certain tying arrangements are unreasonable *per se. International Salt Co. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947). To succeed in a *per se* claim, Cemar must prove that a tying arrangement exists and that Nissan "has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Northern Pac.,* 356 U.S. 6, 78 S.Ct. 518 (citation omitted); *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

The Supreme Court in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), raised the threshold needed for a *per se* violation. It stated that there must be a threshold determination of a "substantial potential for impact on competition" for the *per se* rule to be applicable. *Id.* at 16, 104 S.Ct. at 1560. It emphasized that "forcing" is an indication that there is a restraint in competition for the tied product and that whether the *per se* rule applies depends on whether "forcing is probable" and on "the probability of anticompetitive consequences" in the market for the tied product. *Id.* at 15–16, 104 S.Ct. at 1559–60.

Cemar alleges that Nissan used its total control over popular vehicles, the tying product, to force Cemar into buying unpopular vehicles, the tied product. Cemar bases its claim that the arrangement is unlawful on the fact that it was forced to buy something it did not want. It relies on the language in *Jefferson Parish* "that the es-

sential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force the buyer into the purchase of a tied product that the buyer either did not want at all,* or might have preferred to purchase elsewhere on different terms." *Jefferson Parish,* 466 U.S. at 12, 104 S.Ct. at 1558 (emphasis added).

Nissan does not challenge that Cemar properly alleged two separate products and evidence of forcing. Nissan instead argues that Cemar has not alleged any restraint on competition in the market for the tied product, unpopular vehicles. Nissan claims that, even if Cemar were forced to buy vehicles it did not want, there would be no violation because no competition could be foreclosed. It relies on the language in *Jefferson Parish* that "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, *there can be no adverse impact on competition* because no portion of the market which would otherwise have been available to other sellers has been foreclosed." *Id.* at 16, 104 S.Ct. at 1560.

■ The Court agrees with Nissan that Cemar cannot prove the probable anticompetitive consequences that *Jefferson Parish* requires. Cemar alleged that Nissan had "total control over the allocation of the popular vehicles." Complaint ¶ 16(c). It did not allege that it would have, or even could have, bought the unpopular vehicles elsewhere, and instead alleged that it did not want them at all. It is important to note that because Cemar was exclusively a Nissan dealer, it could only sell Nissan vehicles. Thus, there were no other sellers competing with Nissan to sell unpopular vehicles to Cemar[1] and the alleged tying arrangement could not foreclose competition in the market for unpopular vehicles.

---

**1.** During oral argument, counsel for Cemar discussed the fact that Cemar could buy Nissan vehicles from other dealers, albeit at inflated prices. This was not specifically alleged in the complaint. If there were other suppliers for the unpopular vehicles, substitutes could be available and competition could be foreclosed be-

cause Cemar may be forced to buy the vehicles from Nissan rather than from other sources. However, the fact that Cemar would not have bought the vehicles elsewhere means that no other sellers were foreclosed from the market because of the alleged tying arrangement.

*See Jefferson Parish,* 466 U.S. at 16, 104 S.Ct. at 1560.

An analogous situation in which one party controlled the sales of both products existed in the preseason football ticket cases. In this line of cases, plaintiff season ticketholders challenged the policy of certain teams that a customer could only purchase season tickets if it agreed to also purchase tickets to the team's preseason games. In *Coniglio v. Highwood Services, Inc.,* 495 F.2d 1286 (2d Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974), the Second Circuit held that the plaintiff could not make out a tying claim because the fact that the defendant had a monopoly over the tied product meant that it could not restrain competition in that market. Likewise, in *Driskill v. Dallas Cowboys Football Club, Inc.,* 498 F.2d 321, 323 (5th Cir.1974), the Fifth Circuit held that because the Cowboys had a complete monopoly in the tied product, "there can thus be no adverse effect on any competitors, even if a tying scheme exists." Thus, because Nissan had no competitors in selling unpopular vehicles to Cemar, the alleged situation could not restrain competition in that market and Cemar cannot make out a *per se* tying violation under section 1 of the Sherman Act.

### B. Rule of Reason

■ As with Cemar's allegation of a concerted refusal to deal, its tying claim must be evaluated under the rule of reason because the requirements for a *per se* violation are not met. *See, e.g., Jefferson Parish,* 466 U.S. at 29, 104 S.Ct. at 1567; *see also Innovation Data Processing v. IBM Corp.,* 603 F.Supp. 646 (D.N.J.1984). Cemar does not allege any injury to competition, only injury to its own ability to compete. The Court has demonstrated that the alleged scheme cannot adversely affect competition in the tied product. Thus, for the same reasons described in Section IIIB, *supra,* Cemar has not sufficiently alleged a violation under the rule of reason, and Count III must be dismissed.

### V. COUNT IV—ROBINSON–PATMAN ACT

Cemar alleges that Nissan "has discriminated against plaintiff with respect to the processing, handling, sale, and offering for sale of vehicles and other automotive products, all in violation of [the Robinson–Patman Act,] 15 U.S.C. § 13." Complaint ¶ 30. Cemar alleges that it suffered damages including "loss of profits and business opportunities." Complaint ¶ 31. Although the complaint does not allege violations of specific sections of the Robinson–Patman Act, the parties have narrowed the claim down through the briefing to two sections: price discrimination, section 13(a), and discrimination in services and facilities regarding products sold for resale, section 13(e).

### A. Section 13(a)

Section 13(a) makes it unlawful "to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 13(a) (1982). Cemar alleges three situations that it believes violate this section. First, it alleges that Nissan required it to pay for parts C.O.D. while allowing other dealers to maintain open accounts. Cemar also alleges that Nissan engaged in discriminatory delivery practices by delaying deliveries to Cemar. Finally, it alleges that Nissan discriminated in the allocation of vehicles and parts, and that it was injured by Nissan's refusal to sell all that it wanted. Nissan argues that Cemar fails to state a claim in that it fails to allege any discrimination in *price* and fails to allege any competitive injury resulting from such discrimination.

#### 1. Credit Terms

In the body of the complaint, Cemar alleged that Nissan discriminated against it "with respect to credit terms for purchases of parts, by requiring C.O.D. payments by plaintiff in circumstances in which other, similarly situated dealers were allowed to maintain open accounts." Complaint

¶ 16(i). Although not stated in the complaint, Cemar now argues that this difference constitutes a price discrimination within the scope of section 13(a).

Price discrimination under the Robinson–Patman Act is simply defined as charging different prices to different purchasers. *FTC v. Anheuser–Busch, Inc.,* 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960). However, many courts have concluded that this means the net price actually received by the seller for the goods, including all discounts and allowances. *Conoco, Inc. v. Inman Oil Co., Inc.,* 774 F.2d 895, 902 (10th Cir.1985). Cemar argues that the difference in credit terms meant that Cemar had to pay when receiving the goods while other similarly situated dealers kept their money and were able to invest it. This lost opportunity meant that other dealers were charged less relative to Cemar.

■ It is clear that the decision whether to extend credit is influenced by business judgment and the borrower's financial history, among other factors. Thus, some courts have "uniformly held that discrimination in credit terms is outside the Act's coverage." *Diehl & Sons, Inc. v. Int'l Harvester Co.,* 426 F.Supp. 110, 122 (E.D. N.Y.1976). However, the Tenth Circuit stated that it did not rule out the possibility that there could "be a discrimination in credit of such magnitude or nature as to constitute a violation." *Craig v. Sun Oil Co. of Pa.,* 515 F.2d 221, 224 (10th Cir.1975) (no violation because extreme situation not alleged), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976). Thus, in *Robbins Flooring, Inc. v. Federal Floors, Inc.,* 445 F.Supp. 4 (E.D.Pa.1977), the court denied a Rule 12(b)(6) motion and held that the plaintiff had sufficiently alleged that different credit terms were given to different purchasers. In doing so, the court held that business justifications were defenses not properly considered on a motion to dismiss. *Id.* at 9. Thus, Cemar could make out a claim of discrimination on credit terms. This is because, even though not specifically alleged, the difference between open accounts and no credit at all, or requiring C.O.D. payments, is extreme enough that it could affect the price paid by Cemar.

■ The Court will grant Nissan's Motion to Dismiss this claim, however, because Cemar fails to allege that there was a reasonable probability that the price difference caused by the discrimination in credit terms may harm competition. *Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 438, 103 S.Ct. 1282, 1290, 75 L.Ed.2d 174 (1983). It is well established that a plaintiff must allege competitive injury in a section 13(a) action. *See, e.g., Conoco,* 774 F.2d 895 (the two elements of a section 13(a) violation are price discrimination and injury to competition). In order to meet this requirement, Cemar would have to show actual competitive injury, as shown by market analysis, or predatory intent, as shown by a competitor sacrificing short term revenues to drive Cemar out of the market. *Double H. Plastics, Inc. v. Sonoco Prods. Co.,* 732 F.2d 351 (3d Cir. 1984), *cert. denied,* 469 U.S. 900, 105 S.Ct. 275, 83 L.Ed.2d 212 (1984); *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340 (3d Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982). Cemar alleged injury only to itself, not to competition, and this is "not enough from which a court may infer that an alleged price discrimination may 'substantially' injure competition." *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 548 (9th Cir.1983) (12(b)(6) motion granted for failure to allege competitive injury), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). Because "[t]he naked demonstration of injury to a specific competitor without more is not sufficient," *id.,* the Court grants Nissan's Motion as to credit term discrimination.

### 2. Delivery Practices

Cemar also alleges that Nissan "arbitrarily and in bad faith, delayed the shipping of vehicles" to Cemar. Complaint ¶ 16(h). It claims that it also was injured by this practice. This claim fails because, as with the credit discrimination claim, it fails to allege any competitive injury. Furthermore, Cemar failed to allege any con-

nection between the alleged discrimination in delivery practices and a difference in price. Cemar cites *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945), and *FTC v. A.E. Staley Mfg. Co.*, 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1945), for the proposition that discrimination in delivery terms can constitute price discrimination. These cases, however, involved the "base-point pricing" delivery system, and thus dealt with the *price* of delivery. Cemar has made no such allegation concerning the price of delivery. Thus, Nissan's Motion to Dismiss the section 13(a) claim of discrimination in delivery practices must be dismissed.

### 3. Allocation of Vehicles and Parts

■ Cemar also alleges that Nissan "made vehicles and automotive products available to other dealers more readily, and on more favorable terms, than with respect to plaintiff," Complaint ¶ 16(a), and that Nissan "arbitrarily and in bad faith, refused to honor orders placed by plaintiff, while honoring similar orders placed by similarly situated other dealers." *Id.* at ¶ 16(g). As with the other section 13(a) claims, this claim must be dismissed for failing to allege injury to competition. Even if competitive injury were alleged, however, Cemar would not have sufficiently alleged a section 13(a) claim because it did not allege any price effect.

■ Both of Cemar's claims involve a refusal to sell. Cemar alleged that Nissan refused to make some products readily available and refused to honor some orders altogether. The Robinson–Patman Act only covers discrimination in actual sales and does not cover refusals to deal. *L & L Oil Co., Inc. v. Murphy Oil Corp.*, 674 F.2d 1113, 1120 (5th Cir.1982); *Reliable Tire Dist. Inc. v. Kelly Springfield Tire Co.*, 592 F.Supp. 127, 132 (E.D.Pa.1984). Likewise, a refusal to supply as much as Cemar wanted is also a refusal to deal that is not covered by section 13(a). *Black Gold, Ltd. v. Rockwool Indus., Inc.*, 729 F.2d 676, 682 (10th Cir.1984), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984). Thus,

Cemar's section 13(a) claims dealing with the allocation of vehicles and parts must be dismissed.

### B. Section 13(e)

Section 13(e) concerns discrimination in "services or facilities connected with the processing, handling, sale, or offering for sale of such commodity" to purchasers in the resale business. 15 U.S.C. § 13(e) (1982). It applies to discrimination in advertising and promotional services because these are connected with resale rather than an original sale. *L & L*, 674 F.2d at 1119–29; *Cole v. Ford Motor Co.*, 566 F.Supp. 558, 567 (W.D.Pa.1983). Cemar need not allege competitive injury to claim under this section. *Great Atl. & Pac. Tea Co., Inc. v. FTC*, 440 U.S. 69, 79, 99 S.Ct. 925, 932, 59 L.Ed.2d 153 (1979) ("liablity under [section 13(e)], unlike [section 13(a)], does not depend upon competitive injury"). The Court grants Nissan's motion to dismiss, however, because Cemar does not allege the kind of discrimination that is covered under section 13(e).

The only claim Cemar has pressed under this section is for discriminatory delivery practices. Whether section 13(e) applies to this type of claim is a controversial issue. Cemar cites *Centex–Winston Corp. v. Edward Hines Lumber Co.*, 447 F.2d 585 (7th Cir.1971), *cert. denied*, 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972), which held that discrimination in delivery practices promotes and facilitates (or hinders) resale. Many courts and commentators have criticized that decision. *See, e.g., L & L*, 674 F.2d at 1118 ("*Centex–Winston* has met with much criticism and has been distinguished and rejected by other courts."); *see also Foremost*, 703 F.2d at 546; *Purdy Mobile Homes, Inc. v. Champion Home Builders Co.*, 594 F.2d 1313 (9th Cir.1979); *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F.Supp. 819 (N.D.Tenn.1974). The Court agrees with the Fifth Circuit that "[t]he overwhelming view ... is that delivery is not a service or facility within the meaning of [section 13(e)]." *L & L*, 674 F.2d at 1119. Thus, Cemar fails to state a claim for which relief can be granted

under section 13(e), and Nissan's Motion to Dismiss Count IV is granted.

## VI. COUNT V—RICO

### A. The Claims

In Count V, Cemar alleges that "Defendant and its co-conspirators, including the Coxes, established an enterprise or joint venture, the purpose of which was to acquire, by illegal means, the franchise and related business property of Plaintiff, and in furtherance of said enterprise Defendant and its co-conspirators performed numerous predicate acts in interstate commerce *or by use of the mails,* including, but not necessarily limited to, *antitrust violations and bribery,* all in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et. seq.*" Complaint ¶ 33 (emphasis added). It alleges that it sustained damages in the form of lost profits and the receipt of less money for its franchise than was warranted. Complaint ¶ 16.

Count V alleges specifically only antitrust violations and bribery as predicate acts. It contains no facts unto itself but incorporates other sections of the complaint. Through the exchange of briefs, however, Cemar has apparently withdrawn the claim that the predicate acts were antitrust violations and bribery, and instead argues that the predicate acts were violations of the federal mail fraud statute, 18 U.S.C. § 1341 (1982), and the federal wire fraud statute, 18 U.S.C. § 1343 (1982). In support of this claim, Cemar refers to its prior allegation that "[w]ell prior to the Plaintiff's sale of the franchise, Defendant *transmitted a written notice* to the Motor Vehicle Administration of Maryland, *falsely advising* that Plaintiff was no longer a franchised dealer." Complaint ¶ 19(b) (emphasis added). It also alleges that Nissan *"falsely advised other dealers* that the Coxes had replaced Plaintiff as a dealer, prior to the sale to the Coxes and prior to the approval of the Coxes as a dealer." *Id.* (emphasis added).

**2.** Section 1962(c) reads: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

### B. RICO

To establish a violation of section 1962(c)[2] of RICO, Cemar must allege "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted). In order to maintain a private suit for treble damages, Cemar must also prove that it was "injured in [its] business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c) (1982). The Court holds that Count V must be dismissed because Cemar has failed to sufficiently allege a pattern of racketeering activity.

### 1. Enterprise

Cemar alleges that Nissan conspired with the Coxes and other unnamed co-conspirators to establish an enterprise to acquire Cemar's franchise. It claims that the alleged unlawful activities were done by Nissan with the collaboration and consent of the Coxes. Cemar alleges that this conspiracy constitutes "a group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1982). This allegation is sufficient to put Nissan on notice of what its alleged enterprise is.

To establish that an association is a RICO enterprise, Cemar must demonstrate "(1) that the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) that the members of the enterprise function as a continuing unit with established duties; and finally (3) that the enterprise must be separate and apart from the pattern of activity in which it engages." *Seville Indus. Mach. v. Southmost Mach. Corp.,* 742 F.2d 786, 789–90 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). This is a difficult burden to meet, and Cemar has not specifically alleged all of the characteristics of a RICO enterprise. However, the burden of

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c) (1982).

pleading an enterprise is less than the burden of proof. *Id.* at 791. Thus, Cemar need plead "nothing more at this early junction than that bare allegation" that Nissan and the Coxes formed an enterprise. *Id.* It has done so.

### 2. Racketeering Activity

■■■■■ Cemar claims that the predicate acts committed by the enterprise were acts of mail fraud and wire fraud. A violation of the federal mail fraud statute, 18 U.S.C. § 1341 (1982), requires a scheme to defraud and the mailing of a letter in furtherance of the scheme. *United States v. Murr,* 681 F.2d 246 (4th Cir.), *cert. denied,* 459 U.S. 973, 103 S.Ct. 307, 74 L.Ed.2d 286 (1982). Similarly, a violation of the federal wire fraud statute, 18 U.S.C. § 1343 (1982), requires a scheme to defraud and the use of an interstate wire in furtherance of the scheme. *Harris Trust and Savings Bank v. Ellis,* 609 F.Supp. 1118, 1122 (N.D.Ill. 1985). Although Nissan need not be convicted under these criminal statutes for Cemar to maintain a civil claim against it under RICO, *Sedima,* 473 U.S. 479, 105 S.Ct. 3275, Cemar must allege a violation of at least one of the criminal statutes listed in 18 U.S.C. § 1961(1) (1982) to maintain the suit.

Rule 9(b) of the Federal Rules of Civil Procedure requires that the "circumstances" of fraud "be stated with particularity." Fed.R.Civ.P. 9(b). This rule applies to allegations of fraud under RICO. *See, e.g., Seville,* 742 F.2d at 791 (applying Rule 9(b) to mail and wire fraud allegations). The circumstances of fraud "include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982) (paragraph alleging fraud by "various other defendants" stricken). Courts must balance this strict standard with the notice-pleading idea of Fed.R. Civ.P. 8(a). *Seville,* 742 F.2d at 791. Thus, Cemar is "free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* Cemar need not plead

"with temporal or geographic specificity," but must plead "with sufficient particularity to place the defendants on notice of the conduct of which they are charged and to safeguard against spurious allegations." *Klapper v. Commonwealth Realty Trust,* 657 F.Supp. 948, 959 (D.Del.1987).

Cemar does not sufficiently allege either mail fraud or wire fraud. Nowhere in the complaint does Cemar allege that the racketeering activity consisted of *mail* or *wire* fraud. The two factual allegations it now makes contain no allegation of a use of the mail, 18 U.S.C. § 1343 (1982), or the use of an interstate wire communication. 18 U.S. C. § 1341 (1982). Even applying the more liberal standard for pleading fraud advocated in *Seville,* 742 F.2d at 791, the allegations in this complaint are insufficient.

The first allegation involves "transmitting" a notice to the Motor Vehicle Administration. Cemar identified the agency which received the notice, a rough idea of its content, and that it was "written."_ This allegation does not have sufficient "means of injecting precision and substantiation into" the claim. The complaint does not state that the notice was mailed, only that it was transmitted. Nor does it give any indication of the date of its transmittal. This is insufficient to put Nissan on notice of a mail fraud violation.

Cemar's allegation about false notices to other dealers is even more problematic. Not only does it fail to give the "date, place or time" of the notices, it fails to allege what dealers received them or the method of transmittal. The Court presumes that Nissan, as a supplier, frequently notifies its dealers of a variety of important information and uses a variety of methods of transmittal. Therefore, Cemar's allegation fails to have "the means of injecting precision and substantiation into" the claim and fails to place Nissan on notice of what the alleged violation is. Because Cemar has failed to adequately allege predicate acts of racketeering activity, Count V must be dismissed.

### 3. Pattern of Racketeering Activity

■■■ Even if Cemar had sufficiently alleged mail and wire fraud, however, its

claim would be dismissed because it failed to sufficiently allege a *pattern* of racketeering activity. To constitute a pattern, there must be *"at least two acts* of racketeering activity ... within ten years." 18 U.S.C. § 1961(5) (1982) (emphasis added). The Supreme Court stated that "while two acts are necessary [to establish a pattern], they may not be sufficient." *Sedima,* 473 U.S. at 496, n. 14, 105 S.Ct. at 3285, n. 14. The Court emphasized that "continuity plus relationship" is required. *Id.,* (citing legislative history).

The Third Circuit recently clarified the requirements for a pattern of racketeering activity. The court held that a "single scheme can constitue a RICO pattern" and that the scheme need not be "ongoing or open-ended." *Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36, 39 (3d Cir.1987). It stated that the "continuity" referred to in *Sedima* should not be subject to one verbal formula but should instead be reviewed on a case-by-case basis. The relevant factors include "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Marshall–Silver Const. Co. v. Mark,* 835 F.2d 63, 66 (3d Cir.1987) (*quoting Barticheck,* 832 F.2d at 39).

Cemar alleges one scheme in which Nissan conspired with the Coxes to coerce it to sell its franchise to the Coxes at below market value. It alleges several predicate acts, all dealing with notifying various people that Cemar was no longer a dealer. Cemar does not allege any time span for the activities in question, and it does not allege that any other dealers were the target of the scheme.

These allegations are insufficient to constitute a pattern of racketeering activity. As Judge Stapleton said in *Marshall–Silver:*

> [t]he target of the RICO statute, as its name suggests, is criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a significant period of time. Here we have a single victim, a single injury, and a single short-lived scheme with only two active perpetrators [footnote omitted]. This is not criminal activity with the kind of continuity of which we spoke in *Barticheck."*

*Marshall–Silver* at 66–67. Therefore, Count V would have to be dismissed, even if Cemar had succeeded in making out its mail and wire fraud allegations.

## VII. AMENDING THE COMPLAINT

■■■ The Court holds that Nissan's Motion to Dismiss Counts II through V shall be granted. Cemar desires to amend its complaint under Rule 15(a). Nissan argues that amending the complaint is unnecessary and would unduly delay trying the case.

This lawsuit has an unusual procedural posture. This motion to dismiss was filed more than two years ago in the District of Maryland. Since then, the parties have continuously engaged in discovery. Rule 15(a) instructs that leave to amend "shall be freely granted when justice so requires." Fed.R.Civ.P. 15(a). The fact that Cemar has not previously amended its complaint means that the Court should strongly consider granting its request for leave to amend. Also, the fact that the case has not been set for trial means that no actual trial date will be delayed if the complaint is amended. Furthermore, the Court considers that Cemar may be prejudiced if the Court denies its request because discovery may have revealed that Cemar can prove its allegations.

The Court will grant Cemar thirty days to amend its complaint. However, because of the unusual posture of the case, the Court wishes to avoid purely cosmetic repairs to the complaint. If the Court were to allow Cemar to amend its complaint facially, there may be needless duplicative discovery and delay that would be prejudicial to Nissan. Therefore, the Court requires that Cemar proffer evidence to support the amendments. This is a procedure usually used only when a plaintiff seeks to amend a complaint after a summary judgment motion has been filed. *See, e.g., Car-*

*ey v. Beans,* 500 F.Supp. 580, 582 (E.D.Pa. 1980) (requiring substantial evidence to support the new claims), *aff'd. mem.,* 659 F.2d 1065 (3d Cir.1981). It is warranted here because of the substantial discovery already conducted and the fact that Cemar should now know whether it can prove the allegations of Counts II through V. The Court will then rule on whether the amended complaint and supporting evidence are sufficient to allege the claims.

The Court also holds that Cemar must reimburse Nissan for any duplicative discovery not initiated by it and caused by the amended complaint. *See Outboard Marine Corp. v. Pezetel,* 535 F.Supp. 248, 253 n. 8 (D.Del.1982) (conditioning leave to amend of plaintiff's compensating defendant for fees and expenses on the duplicative discovery).

An Order will issue in conformity with this Opinion.