Gloria **HELMAN, individually and, as a representative of the Estate of Sandra Mendelson, Plaintiff,**

v.

**MURRY'S STEAKS, INC., Murry Mendelson, Ira Mendelson and the Rymer Company, Defendants.**

Civ. A. No. 86–469 LON.

United States District Court, D. Delaware.

July 9, 1990.

See also, 728 F.Supp. 1099.

Leone L. Ciporin of Lassen, Smith, Katzenstein & Furlow, Wilmington, Del., for plaintiff; Entin, Schwartz, Margules & Lazarus, Fla., of counsel.

Michael D. Goldman and Stephen C. Norman of Potter Anderson & Corroon, Wilmington, Del., for defendants; Herbert E. Milstein and Andrew N. Friedman of Cohen, Milstein & Hausfeld, Washington, D.C., of counsel, for defendants Murry's Steaks, Inc. and The Rymer Co.; Burton A. Schwalb, Steven Sarfatti and Joe D. Jacobson of Schwalb, Donnenfeld, Bray & Silbert, Washington, D.C., of counsel, for defendants Murry Mendelson and Ira Mendelson.

## OPINION

LONGOBARDI, Chief Judge.

The Plaintiff Gloria Helman commenced this action individually and as a personal representative of the estate of her deceased mother, Sandra J. Mendelson, seeking damages against Murry's Steaks, Inc. ("MSI"), her uncle, Murry Mendelson, her cousin, Ira Mendelson (the "MSI Defendants") and the Rymer Company ("Rymer") for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, the Delaware and/or Maryland Blue Sky Laws as well as fiduciary and other common law duties. The Second Amended Complaint (the "Complaint"), Docket Item ("D.I.") 54, alleges that the MSI Defendants conspired with and entered into a course of conduct with the Defendant Rymer designed to defraud Plaintiff and her mother by withholding material information regarding the business of MSI, its financial condition and its future values through a proposed merger with Rymer. The fraud allegedly caused the Plaintiff and her mother to sell their minority interest in MSI for less that its true value.

Presently before the Court are Plaintiff's motion for partial summary judgment on Counts I, II, III, V and VI of the Complaint, the MSI Defendants' motion for summary judgment on all Counts and De-

fendant Rymer's motion for summary judgment.

## I. FACTS

MSI, until it was acquired by Rymer in 1985, was a family owned and operated retail food business specializing in economically processed frozen meats. D.I. 35, ¶ 6. It was founded in the 1940s by the late Alfred G. Mendelson, father of Murry Mendelson and the late Sandra Mendelson. *Id.*, ¶ 10. Upon the death of Alfred G. Mendelson in 1972, controlling ownership of MSI was transferred to his spouse, Ida Mendelson, and to the Alfred G. Mendelson Trust (the "Mendelson Trust").[1] Minority interests were transferred to his children, Murry Mendelson and Sandra Mendelson.

Defendant Murry Mendelson was integrally involved in the operation of the company since its inception. D.I. 77A, Exhibit ("Ex.") C. He subsequently became president and served as a director for most of the time relevant to this lawsuit. Defendant Ira Mendelson is Murry Mendelson's son who also served as an officer and director at all times relevant to the lawsuit. Both the Plaintiff and her mother, Sandra Mendelson, had been employed by MSI in various capacities. *Id.*, Ex. E at 59.

1. Alfred G. Mendelson's will devised all of his MSI voting stock to his wife, Ida Mendelson, and all non-voting stock to the Mendelson Trust. D.I. 35, ¶ 10. The Trust gave a life interest to Ida, with contingent remainder interests to Murry Mendelson and Sandra Mendelson if they should survive their mother. *Id.* If Murry Mendelson and Sandra Mendelson did not survive their mother, each of their 50% interest would pass in equal shares to their heirs. Murry and Ida Mendelson are Trustees of the Mendelson Trust. *Id.*

2. The Stock Redemption Agreement states:
 The Stockholder shall not, during his lifetime, transfer, encumber or dispose of any portion of his stock interest in the Corporation, except that, if he should desire to dispose of said stock during his lifetime, he shall first offer to sell such stock to the Corporation at a price determined in accordance with the provisions of Paragraph 4 above, and the valuation be as of the immediately preceding last day of the fiscal year of the Company prior to the date of offer.

3. The circumstances behind Sandra Mendelson's request to be bought out are in dispute.

In 1977, MSI underwent a recapitalization which created new classes of voting, non-voting and preferred stock. Pursuant to this recapitalization, each MSI stockholder signed a stock redemption agreement granting MSI the option to purchase their stock at "book value" based on the preceding fiscal year should they decide to sell their MSI stock during their lifetime. D.I. 77A, Ex. A. at 5.[2]

At some point in 1980, Sandra Mendelson approached Murry Mendelson and asked to have her MSI stock purchased by MSI. *Id.*, Ex. C.[3] At that point, the Plaintiff joined in her mother's request. Shortly thereafter, Sandra Mendelson's attorney, Saul Schwartzbach, and MSI's attorney, Richard Meyer, began negotiating the terms under which MSI would repurchase Sandra Mendelson's and the Plaintiff's MSI interests.[4] The result of these negotiations was a Letter of Intent setting forth the complete details of the stock redemption by MSI. The Letter of Intent was signed by the Plaintiff and Sandra Mendelson in March of 1982 and was reduced to a Definitive Agreement (the "Definitive Agreement") embodying the same terms which became effective on November 30, 1982. D.I. 77A, Ex. O.

Defendants assert that Sandra Mendelson was a disgruntled employee and minority stockholder who often quarreled with other employees and members of the family and that she left on her own accord. D.I. 77A, Ex. B, D. Plaintiff, however, contends that she and her mother were mistreated by other family members and were ultimately forced out of their ownership of MSI. D.I. 80A, Ex. 1.

4. There is a dispute between the parties with respect to the information provided by MSI to Sandra Mendelson's attorneys and accountants in connection with the determination of the price at which MSI would repurchase Sandra Mendelson's interests. Defendants assert that Herman Kessler, Sandra Mendelson's accountant, had been provided with MSI's 1980 financial statements and had reviewed MSI's 1981 financial statements. D.I. 77A, Ex. B at 79–81, C at 56, H at 67. Plaintiff, however, asserts that none of Sandra Mendelson's advisors had been provided with 1981 MSI's financial statements. D.I. 80A, Ex. 3 at 41, 93, 170.

The Definitive Agreement provided for two separate closings. At the first closing, MSI was to pay for all MSI stock that Sandra Mendelson and the Plaintiff owned outright in their own names. Sandra Mendelson was to receive 1.7 million dollars, $540,000 in cash and the remainder in a note and the Plaintiff was to receive $18,000 in cash. D.I. 77A, Ex. O, ¶¶ 3, 11. At the second closing, which was to occur either sixty days after the death of Ida Mendelson or, pursuant to MSI's option, at an earlier date, MSI would close on and pay for the Plaintiff's and Sandra Mendelson's contingent interest in the Mendelson Trust. Under the terms of the Letter of Intent and the Definitive Agreement if at the time of the second closing, Ida Mendelson had predeceased Sandra Mendelson, then Sandra Mendelson would be entitled to 1.33 million dollars in the form of a promissory note for her interests in the Mendelson Trust. If at the time of closing, Ida Mendelson and the Plaintiff survived Sandra Mendelson, then the Plaintiff would be entitled to a note worth $665,000 for the 50% of her mother's interest in the Mendelson Trust which she would have inherited. *Id.,* ¶ 13.

The first closing occurred on February 28, 1983, at which time MSI tendered the cash and note pursuant to the Definitive Agreement. In consideration for these payments, Sandra Mendelson and the Plaintiff endorsed and delivered over the certificates to the MSI stock registered in their own names. In addition, Sandra Mendelson and the Plaintiff assigned to MSI all right, title and interest in any MSI stock they might subsequently acquire. D.I. 77A, Ex. Q.[5]

In the autumn of 1984, Rymer, a major supplier of portion-controlled meat, expressed an interest in acquiring MSI. D.I. 73A, Ex. 1 at 40. Murry Mendelson and Ira Mendelson visited Rymer's plant in Chicago but indicated that at that point that they were uninterested in being acquired by Rymer. D.I. 77A, Ex. T. However, at a meeting in February of 1985 attended by Murry Mendelson, Ira Mendelson and Norman Chapman, an investment banker representing Rymer, Rymer again made an offer to purchase MSI. D.I. 77A, Ex. B. This offer was for 30 million dollars plus 200,000 shares of Rymer which was then trading at $15 per share. D.I. 73A, Ex. 1. Although remaining noncommittal with respect to the second Rymer offer, MSI retained the investment banking firm of First Boston to conduct an analysis of what MSI might be worth if it were sold to a third party. *Id.,* Ex. B at 43–47. With the aid of First Boston, negotiations continued between Rymer and MSI. On September 27, 1985, the parties signed an agreement whereby Rymer would acquire MSI for 57 million dollars.[6]

---

5. Paragraph 2 of the February 28, 1983, Assignment states:
 SJM and GH [the Plaintiff] sell, transfer, deliver, assign, and convey unto MSI all shares of stock of MSI to which they or either of them would at any time or from time to time hereinafter become entitled to receive, including those they would own now by reason of a Transfer by IM [Ida Mendelson].

6. There is significant dispute over when the parties reached their agreement in principle. The Plaintiffs contend that the agreement between Rymer and MSI whereby Rymer would acquire MSI for 57 million dollars was reached in principle on July 3, 1985. The deposition of Ira Mendelson, D.I. 73A at A105, states:
 Q: After that mid-June '85 meeting, was there any subsequent meeting with Rymer?
 A: Yes.
 Q: And when did that take place, sir?
 A: July 3d of 1985.
 \* \* \* \* \* \*
 Q: And what took place during that meeting?

A: To make a long story short, what took place at that meeting was, during the day and by the end of the day, we seemed to reach an agreement in principle, based on financial terms, although not confirmed and certainly needing board approval and a lot of other documents by Rymer Company. We reached an understanding that made it possible for us to move forward with an acquisition.
Defendants, on the other hand, contend that an agreement in principle was not reached until September 26, 1985. The deposition of MSI counsel, Richard Meyer, D.I. 77A, Ex. B at 55, states:
 Q: Subject to the approval of the Rymer board and other entities within Rymer that might have to approve it, was there an agreement, in principle, with regard to an acquisition of MSI by Rymer [at the July 3d 1985 meeting]?

On July 23, 1985, MSI sent a notice to the Plaintiff advising her that pursuant to the Definitive Agreement, the second closing would take place in 60 days. D.I. 77A, Ex. U. Upon receiving this information, Plaintiff contacted several of her lawyers to determine whether she was obligated to perform under the agreement. One of her attorneys, John Cogar, who represented both the Plaintiff and Sandra Mendelson at the first closing, advised the Plaintiff that she was required to go through with the second closing. *Id.*, Ex. G at 154. Maurice Rhinehardt, another of the Plaintiff's attorneys, contacted MSI's counsel, Richard Meyer, requesting a description of the terms of the second closing and financial information regarding MSI. D.I. 73C, Ex. 24. MSI declined to provide Rhinehardt with their financial information. *Id.* at Ex. 19.

Meyer and Rhinehardt had several conversations regarding the terms of the second closing. D.I. 77A, Ex. S at 23–24. In one of the earliest conversations, Meyer stated to Rhinehardt that MSI was presently negotiating for the sale of the company to a third party but declined to provide any further information. *Id.* at 56–59.

MSI's contention with resect to the terms of the closing were that the Plaintiff was entitled to a note in the amount of $665,-000. Rhinehardt, however, questioned whether the Plaintiff was entitled to more money under the agreement. Ultimately, MSI amended the Definitive Agreement to allow for the Plaintiff to receive $665,000 in cash *and* a note for another $665,000.[7] Included in the amended agreement which was signed at the second closing was a clause releasing both parties from any liability associated with the amendments. D.I. 77A, Ex. B.

## II. DISCUSSION

In Plaintiff's motion for partial summary judgment, she contends that there are no genuine issues of material fact with respect to the 10b–5 claim, the fraud claim, the negligent misrepresentation claim and the breach of fiduciary duty claims as they relate to the second closing. Plaintiff asserts that she is entitled to judgment as a matter of law on the 10b–5 claim because the Defendants, in the face of an uncompromising duty to disclose the terms of the Rymer transaction, knowingly misrepresented or omitted material facts in connection with the purchase of a security. Plaintiff further asserts that because she is entitled to judgment as a matter of law on the 10b–5 claim, she is also entitled to judgment on the fraud claim. Finally, Plaintiff asserts that she is entitled to judgment as a matter of law on the breach of fiduciary duty claims. She contends that Ira Mendelson in his capacity as a director of MSI breached his duty of due care, loyalty and candor in connection with the repurchase of her MSI stock. In addition, she alleges that Murry Mendelson in his capacity as both a director of MSI and as a trustee of the Mendelson Trust breached his fiduciary duties.

MSI Defendants move for summary judgment on all counts asserting that: (1) with respect to all counts, Plaintiff signed an agreement releasing Defendants from all liability; (2) with respect to Count I alleging a violation of Rule 10b–5, Plaintiff's claim is barred by the applicable statute of limitations and by her failure to establish the requisite elements of reliance, scienter, "security" and "in connection with the purchase or sale"; (3) with respect to Count II alleging common law fraud and Count IV alleging state Blue Sky Law violations, Plaintiff's claims are barred by the applicable statute of limitations and by her failure to establish the elements of reliance and scienter; (4) with respect to Count III

A: Absolutely no—.
 * * * * * *
Q: Did there come a time when the principle financial terms of an acquisition between Rymer and MSI was agreed to?
A: Did there? Yes.
Q: When was that, sir?

A: Probably September 27, 26th.

7. The parties disagree on who proposed the idea of amending the agreement to provide for the increased payments. The Plaintiff asserts that MSI offered the increase, D.I. 73B, Ex. 6 at 175, and Defendants assert that Rhinehardt demanded the increase. D.I. 73A, Ex. 4 at 125.

alleging negligent misrepresentation, Plaintiff's claims are barred by the applicable statute of limitations and by her failure to establish reliance; (5) with respect to Counts V and VI alleging breaches of fiduciary duty, Plaintiff's claims are barred by the applicable statute of limitations and because Defendants fulfilled any fiduciary duties they might have owed her; and (6) with respect to Count VII alleging violations of the RICO Act, the claims brought on behalf of the Estate of Sandra Mendelson did not survive her death and the Plaintiff cannot establish the necessary elements of "pattern" or "enterprise" with respect to her individual claim.

The MSI Defendants also seek summary judgment on their counterclaim which alleges violations of the terms of the release signed by the Plaintiff.

Defendant Rymer moves for summary judgment on all counts alleged against it asserting that: (1) Plaintiff has failed to establish the existence of the necessary elements of knowledge, recklessness or negligence; (2) Plaintiff has failed to establish a duty owed by Defendants; (3) Plaintiff has failed to establish the element of reliance, and; (4) Plaintiff's federal securities claims are time barred.

### A. *Summary Judgment*

■ All parties have moved for summary judgment. Summary judgment will be granted to a moving party where that party has established that there exist no disputes of material fact and that it is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The Court's first inquiry then is whether the moving party has established that there are no genuine disputes of material fact which would preclude a finding of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this analysis, materiality is determined by the substantive law which governs the case. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

■ Once an absence of disputes of material fact has been established, the moving party must prove that it is entitled to judgment as a matter of law. If the moving party will bear the burden of proof at trial, his burden in this regard on summary judgment is to make a showing sufficient to establish the existence of every element essential to his case. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

■ If the moving party will not bear the burden of proof at trial, his burden on summary judgment is to make a showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3rd Cir. 1987) (en banc), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). He is not required, however, to support his motion with affidavits or other similar materials *negating* the nonmovant's claim. *Celotex*, 477 U.S. at 321, 106 S.Ct. at 2552. The nonmovant in this situation is then required to come forward and establish the existence of every element of his claim. *Id.* at 322, 106 S.Ct. at 2552.

■ The filing of cross-motions for summary judgment does not require the Court to grant summary judgment for either side. *Mingus Constructors, Inc. v. U.S.*, 812 F.2d 1387, 1391 (Fed.Cir.1987).

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

*Rains v. Cascade Industries, Inc.*, 402 F.2d 241, 245 (3rd Cir.1968).

■ With respect to all of the parties' motions, the Court must view them by con-

sidering the facts and all reasonable inferences most favorably to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Chipollini*, 814 F.2d at 900; *Hersh v. Allen Products Co., Inc.*, 789 F.2d 230, 232 (3rd Cir. 1986).

B. *10b–5 Claims*

1. Statute of Limitations

■■■ The Third Circuit recently established the applicable statute of limitations for violations of Rule 10b–5. Claims will be barred if they are not brought within one year after the plaintiff discovers the facts constituting the violation and, in no event, more than three years after such violation. *In re Data Access Systems Securities Litigation*, 843 F.2d 1537, 1550 (3rd Cir.1988) (en banc), *cert. denied sub nom., Vitiello v. I. Kahlowsky & Co.*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988).[8]

(a) *The First Closing*

■■■ The MSI Defendants and Defendant Rymer assert that Plaintiff's 10b–5 claims arising out of the Definitive Agreement are barred by the three year absolute time limitation. Defendants argue that because the Definitive Agreement was signed on November 30, 1982, and because the complaint in this action was not filed until, at the earliest, October, 1986, all claims

stemming from the Definitive Agreement are barred.

Because the Definitive Agreement was executory in nature and required future performance by both parties, Plaintiff contends that "there were ongoing contractual, fiduciary and federal securities law obligations running between the parties, such that the absolute three year bar ... could not and did not terminate at least until three years after Closing No. 2 on September 24, 1985."

In the analysis of whether Plaintiff's 10b–5 claims are barred by the three year limitation, the first question is when a cause of action under Rule 10b–5 accrues. Simply stated, "[a] 10b–5 cause of action accrues on the date that the purchase or sale of securities occurred." *Hill v. Equitable Bank, Nat. Ass'n*, 599 F.Supp. 1062, 1072 (D.Del.1984), *aff'd, Hill v. Equitable Trust Co.*, 851 F.2d 691 (3rd Cir. 1988) ("Hill I"), *quoted in Hill v. Equitable Bank*, 655 F.Supp. 631, 638 (D.Del.1987) ("Hill II").[9]

■■■ Therefore, the Plaintiff's 10b–5 cause of action accrued when she and her mother sold their MSI securities to MSI. The purchase and sale of securities occurs within the meaning of Rule 10b–5 when the parties to the transaction are committed to one another. *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2nd Cir.1972). That is, once the parties make the investment decision and enter into a binding commitment to perform the trans-

---

**8.** The fact that the *Data Access* holding was not in existence at the time the Plaintiff brought this action will not prevent the Plaintiff's 10b–5 action from being dismissed as untimely. Cases similar to the present case have applied the *Data Access* decision retroactively. See *Hill v. Equitable Trust Co.*, 851 F.2d 691, 695 (3rd Cir. 1988), *cert. denied sub nom., Data Control North, Inc. v. Equitable Bank Nat. Assoc.*, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989). In addition, the Plaintiff does not contest the applicability of the *Data Access* holding to the present situation.

**9.** It could be argued that although the cause of action accrues at the time of the purchase or sale of securities, the limitations period does not begin to run until the plaintiff discovers the fraud. "Under the federal doctrine of 'equitable

tolling' the statute of limitations does not begin to run on a cause of action for fraud if the plaintiff "remains in ignorance of [the fraud] without any fault or lack of diligence on his part." *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

However, the Third Circuit, in its definitive statement of the statute of limitations under a 10b–5 action held, "the proper period of limitations for a complaint charging violations of section 10(b) and Rule 10b–5 is one year after the plaintiff discovers the facts constituting the violation, and *in no event* more than three years after such violation." *In re Data Access Systems Securities Litigation*, 843 F.2d at 1550 (emphasis added). It is apparent, then, that the doctrine of "equitable tolling" is inapplicable to the three year absolute bar on actions brought under Rule 10b–5.

action, the purchase and sale is complete. *Hill II*, 655 F.Supp. at 638. *See also Goodman v. Poland*, 395 F.Supp. 660, 690–91 (D.Md.1975); *Rochez Bros., Inc. v. Rhoades*, 353 F.Supp. 795, 801–02 (W.D. Pa), *aff'd as to liability*, 491 F.2d 402 (3rd Cir.1973). Commitment is defined as "the point at which ... there [is] a meeting of the minds of the parties; it marks the point at which the parties obligat[e] themselves to perform what they [have] agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Radiation Dynamics, Inc.*, 464 F.2d at 891.

On the other hand, if the parties enter into an agreement to purchase securities into the future and the parties possess the power to terminate the agreement, any additional investment of money may be seen as a new investment decision and thus a new purchase or sale. *Goodman v. Epstein*, 582 F.2d 388, 409 (7th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

Several courts have addressed the investment decision doctrine and the question of when a purchase or sale for Rule 10b–5 purposes takes place. In the seminal case of *Radiation Dynamics*, 464 F.2d 876, the Plaintiff, Radiation Dynamics, sold stock of another company, TRG, just three months before TRG engaged in a merger which greatly increased the value of the TRG stock.

The evidence at trial showed, among other things, that Radiation Dynamics agreed to sell and Goldmuntz, Chief Executive Officer of TRG, agreed to purchase 500 shares of TRG stock on June 24, 1964, and that the transaction closed on August 17, 1964. The evidence also showed that Goldmuntz had put Radiation Dynamics in contact with the California Group which had agreed on June 14, 1964, to purchase 3,000 shares of TRG from Radiation Dynamics. The California Group transaction closed on August 3, 1964.

Meanwhile, on July 24, after both transactions had been agreed to but before either had closed, TRG entered into negotiations with Control Data Corporation ("CDC") in which both parties were "seriously considering a merger." In mid-September, CDC made an acceptable offer and the merger was finalized on November 12, 1964.

Radiation Dynamics argued that under Rule 10b–5 it was entitled to disclosure of material information up to the time when the securities were transferred and paid for. TRG asserted that the time at which the duty to disclose material information ceased was when the parties committed to the transaction because that is when the purchase and sale took place. In ruling on this question, the Second Circuit stated:

> ... Judge Pollack correctly instructed the jury when he stated that the time of a "purchase or sale" of securities within the meaning of Rule 10b–5 is to be determined as the time when the parties to the transaction are committed to one another. A party does not, within the intendment of Rule 10b–5, use material inside information unfairly *when he fulfills contractual commitments which were incurred by him previous to his acquisition of that information*, for, as Judge Pollack instructed the jury, the Rule imposes "no obligation to pull back from a commitment previously made by the buyer and accepted by the seller because of after acquired knowledge." * * * "Commitment" is a simple and direct way of designating the point at which, in the classical contractual sense, there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.

*Id.* at 891 (emphasis added). The operative factor for the Court was the absence of the ability of the parties to terminate the transaction after they had committed to the agreement. In order for material information to be relevant, the party receiving it must be in a position to make an investment decision based upon the material information. Where the parties are obligated to perform under an agreement, the disclosure or non-disclosure of subsequent-

ly acquired information ceases to be of importance.

The present case is factually similar to the *Radiation Dynamics* case.[10] Although the Definitive Agreement entered into on November 30, 1982, anticipated two separate closings which were to occur in the future, the parties nonetheless committed and obligated themselves to the transaction at the time they entered the agreement. Under *Radiation Dynamics* then, the purchase and sale in the present case took place on November 30, 1982, when the parties signed the Definitive Agreement and committed to the transaction, not when the securities were transferred for money.

Another case dealing with the question of when a purchase or sale takes place for 10b–5 purposes is *Goodman v. Epstein*, 582 F.2d 388. The *Goodman* case involved a limited partnership agreement in which the limited partners had the option of purchasing their partnership interests either in a lump sum up front or over the course of time pursuant to calls for capital by the general partners. The plaintiffs in that case opted to make periodic contributions to the partnership. The plaintiffs asserted that at some point after they made their initial investment, but prior to the time they made their last contribution to the partnership, the general partners became aware of damaging information and withheld that information from the limited partners.

In addressing the plaintiff's complaint, the general partners asserted that even if they did possess and fail to disclose material information, they were not liable under 10b–5 because the omission, if any, was not in connection with the purchase or sale of a security. The defendants claimed that the purchase and sale of the security occurred at the time that the limited partners initially invested in the partnership and, at that point, the general partners had not failed

to disclose any information. Plaintiffs contended that each subsequent contribution to the partnership involved an independent investment decision and therefore a new purchase and sale of securities.

The court agreed with the plaintiffs and held that the case presented a different issue than did *Radiation Dynamics*. In *Radiation Dynamics* the transaction contemplated was a "one-shot deal" whereas the transaction in *Goodman* contemplated a continuing relationship between the limited partners and the general partners. *Goodman v. Epstein*, 582 F.2d at 412. In determining that the transaction contemplated a continuing relationship, the court focused on the extent to which the limited partners could have utilized the information withheld by the general partners in their decision to continue investing in the partnership. The court found that the limited partners were not obligated to continue making contributions to the partnership and could have used the information withheld by the general partners in a decision not to continue investing. *Id.* at 412. The court specifically stated that this was not a situation where "the information, even if supplied, would not have entitled the plaintiff to refuse to carry out the transaction." *Id.* Because there was a new investment decision with regard to each contribution to the partnership, each contribution constituted a new purchase of securities.

The case at bar differs from *Goodman* in that here, both parties were obligated to perform under the November 30, 1982, Definitive Agreement regardless of what information either would subsequently come to possess. The obligation to perform precluded the possibility of a new investment decision when subsequent payments were made pursuant to the original agreement. Where there is no new investment decision, there is no new purchase or sale of securities.

10. The only factual distinction is that in the present case the parties dispute when the agreement in principle to effectuate the merger was made. In *Radiation Dynamics* the agreement in principle was made after the deal closed whereas in the present case it is unclear whether the agreement in principle was reached before or

after the second closing. However, under the *Radiation Dynamics* holding, this distinction is irrelevant because all that really matters is that the material information be acquired after the time of commitment by the parties. There is no question about whether that occurred in the present case.

The District of Delaware addressed the investment decision doctrine in a string of cases culminating in *Hill II*, 655 F.Supp. 631. *Hill II* dealt with a limited partnership situation fairly similar to that in *Goodman*. The difference between the two cases, however, is that in *Hill II* the limited partners either paid for their partnership interests up front or made subsequent payments of specific amounts at specific times and guaranteed the subsequent payments with an irrevocable letter of credit. *Id.* at 635. Again, like *Goodman*, the limited partners alleged that the general partners withheld material information acquired after the initial investment, but prior to the subsequent payments.

For statute of limitations purposes, the plaintiffs asserted that each subsequent payment constituted a new purchase of securities. Defendants argued that the parties were committed when they made the initial investment and thus there was only one purchase and sale.

The court, citing *Radiation Dynamics* and distinguishing *Goodman* held that because the limited partners were obligated to make the subsequent payments, no investment decision was made when the subsequent payments were tendered and thus the payments did not constitute new purchases of securities. *Hill II*, 655 F.Supp. at 639.

Similarly, in the present case, the Plaintiff and her mother were obligated to participate in the closings agreed upon in the November 30, 1982, Definitive Agreement. There can be no question that the Plaintiff and her mother intended to commit themselves to relinquishing all of their interests in MSI at the time of the signing of the Definitive Agreement. The Definitive Agreement expressly states:

> 2.01 [Sandra Mendelson] agrees to sell, transfer, assign and convey to MSI, and MSI agrees to purchase from SJM all Shares of Stock of MSI that are currently titled or after the date of the execution of this Agreement become titled in the name of [Sandra Mendelson], including without limitation those Shares of Stock

of MSI listed on Exhibit A annexed hereto.

> \* \* \* \* \* \*

> 2.01 [Gloria Helman] agrees to sell, transfer, assign and convey to MSI, and MSI agrees to purchase from GH all Shares of Stock of MSI that are currently titled or after the date of this Agreement become titled in the name of GH, including without limitation those Shares of Stock listed on Exhibit B annexed hereto.

D.I. 77A, Ex. O at 3–4.

If there is any doubt that the Plaintiff and her mother committed themselves to divesting all of their interests in MSI more than three years prior to the filing of this law suit, that doubt is dispelled by the document that they both signed at the first closing which occurred on February 28, 1983. In that document, the Plaintiff and Sandra Mendelson again expressly stated that they were obligated to part with any and all MSI interests that might inure to them in the future. The document signed at the first closing states:

> [Sandra Mendelson] and [Gloria Helman] sell, transfer, deliver, assign, and convey unto MSI all shares of stock of MSI to which they or either of them would at any time or from time to time hereinafter become entitled to receive, including those they would own by reason of a Transfer by Ida Mendelson.

D.I. 77A, Ex. Q at 1.

It is clear then that on two separate occasions occurring more than three years before the filing of the complaint in this action the Plaintiff and her mother signed agreements committing them to sell all of their interests in MSI. In the face of such obligations, the Plaintiff and her mother were not in a position to terminate the agreement and thus cannot be deemed to have made investment decisions at the times of the closings. The closings, therefore, did not constitute additional purchases or sales of securities. Because the only purchase of securities occurred on November 30, 1982, or at the very latest, on February 28, 1983, and the complaint in this action was not filed until at the earliest

October, 1986, all 10b–5 claims stemming from that 1982 agreement are barred by the absolute three year limitation on 10b–5 claims.

### (b) *The Second Closing*

■ Although Plaintiff does not make the argument in this context, it could be argued that despite the existence of the three year absolute bar on 10b–5 claims stemming from the November 30, 1982, Definitive Agreement, the renegotiation of the terms of the agreement at the second closing in July of 1985 constitutes a new and different sale of securities.

Defendants argue that the Plaintiff relinquished her interest in MSI in November of 1982 and that the subsequent modification of the agreement did not revive such interest.

In light of the authority cited above, *i.e., Radiation Dynamics, Hill II,* the Court agrees with the Defendants. Under both *Radiation Dynamics* and *Hill II,* the operative question was whether the purchaser and seller were obligated to perform at the time they entered the agreement. From the discussion above, it is clear that the Plaintiff was obligated to perform when she entered into the November 30, 1982, Definitive Agreement. The modification of the agreement whereby the Plaintiff received twice as much money at the second closing as had previously been agreed upon did not alter the Plaintiff's obligation to perform under the contract. Had the Plaintiff declined to accept the increased offer, she would still have been faced with the same decision, that is, either perform under the contract or be sued.

The 10b–5 claims stemming from the second closing are therefore barred by the statute of limitations.

### C. *RICO Claims*

In Count VII of the Complaint, Plaintiff alleges that the conduct of the Defendants in the purchase of Plaintiff's and Sandra J. Mendelson's MSI interests violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1961, *et seq.*[11] Specifically, the Plaintiff alleges: (1) that the Defendants' actions constituted a "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5); (2) that Defendants Murry Mendelson and Ira Mendelson were "persons" pursuant to 18 U.S.C. § 1961(3); (3) that Defendant MSI was an "enterprise" pursuant to 18 U.S.C. § 1961(4); (4) that Defendants Murry Mendelson and Ira Mendelson derived income from racketeering activity and used or invested the income in an enterprise in violation of 18 U.S.C. § 1962(a); (5) that Defendants Murry Mendelson and Ira Mendelson maintained control of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b); (6) that Defendants Murry Mendelson and Ira Mendelson engaged in the conduct of an enter-

---

11. The RICO statute prohibits the following activities, 18 U.S.C. § 1962:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(b) It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity....

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section.

18 U.S.C. § 1961(1) defines racketeering activity as:

(B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) * * * or (D) any offense involving ... fraud in the sale of securities....

*18 U.S.C. § 1961(5) defines a patter of racketeering activity as:*

... at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of the prior act of racketeering activity.

prise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); and (7) that all Defendants conspired to violate RICO in violation of 18 U.S.C. § 1962(d).

In arguing that the Court must grant summary judgment on the Plaintiff's RICO claims, the MSI Defendants and Defendant Rymer assert that: (1) Sandra J. Mendelson's RICO claims do not survive her death; (2) Plaintiff has failed to establish the requisite acts of racketeering; (3) the predicate acts do not establish a pattern of racketeering activity; (4) Plaintiff has not alleged a RICO "person" distinct from the alleged RICO "enterprise"; (5) the claims brought under section 1962(a) fail because the Plaintiff was not injured by the use or investment of income obtained from racketeering activity; (6) the claims brought under section 1962(b) must fail because Plaintiff was not injured from the acquisition or maintenance of an interest in or control of an enterprise; and (7) Plaintiff has failed to make out the requisite elements of the claim under section 1962(d). The Court will address those arguments which are necessary to the disposition of the motions.

### 1. Acts of Racketeering

To establish liability under the RICO statute, a plaintiff must prove that the defendant committed at least two acts of racketeering activity as it is defined in 18 U.S.C. § 1961. In the Complaint, Plaintiff has alleged predicate acts consisting of mail fraud, wire fraud and fraud in the sale of securities. In their motion for summary judgment, Defendants have asserted that the Plaintiff has failed to produce sufficient evidence to show the commission of the predicate offenses. Because Defendant Rymer is only alleged to have conspired to commit RICO, the predicate act analysis with respect to Rymer differs from that with respect to the MSI Defendants.

#### (a) The MSI Defendants

(i) The Securities Fraud Predicate Acts

In her RICO claim, the Plaintiff asserts that the 10b–5 violations alleged with re-

spect to the first and second closings constitute acts of racketeering as defined by the statute. Despite the Court's finding that these causes of action are barred by the statute of limitations, if the Plaintiff successfully presents evidence of the 10b–5 violations, then she has also established the predicate acts necessary for the RICO claim. An analysis of whether the 10b–5 claims would survive summary judgment is therefore necessary.

#### a. The First Closing

With respect to the original agreement, Plaintiff asserts that the MSI Defendants failed to provide her and her mother with current financial information about MSI despite repeated requests to do so. Additionally, Plaintiff asserts that the MSI Defendants, with knowledge of the falsity of their statements, made verbal assurances to the Plaintiff and her mother that MSI's then current financial situation was not substantially different from that expressed in the financial statements with which they were provided.

To successfully avoid summary judgment here, the Plaintiff must come forward with sufficient evidence of: (1) a misrepresentation or actionable omission; (2) in connection with the purchase or sale of a security; (3) made by the defendant with scienter; (4) that is misleading as to a material fact; (5) reliance by plaintiff; and (6) causation. *Basic, Incorporated v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976).

Viewing the evidence in the light most favorable to the Plaintiff, as the Court must for present purposes, the Court finds that the Plaintiff has successfully come forward with sufficient evidence to establish the existence of a 10b–5 violation with respect to her mother's sale of her MSI interests but has been unsuccessful in establishing the existence of a violation with respect to her own sale. There is evidence in the record that MSI's counsel, Richard Meyer, failed to provide the Plaintiff and Sandra Mendelson with 1981 MSI financial information. D.I. 80A, Ex. 3 at 41, 93.

There is evidence that in response to requests for this information, MSI's counsel stated that the 1981 information was substantially the same as the 1980 information. D.I. 80A, Ex. 4 at 81–85. There is evidence that this statement was misleading. D.I. 80A, Ex. 12. There is evidence that the misstatement related to material information; that is, the misstatement related to information that a reasonable person would have considered important in his decision to sell his stock. D.I. 80A, Ex. 4 at 81–82.

Defendants argue that the Plaintiff and her mother did not rely on the material misstatement and point to the Plaintiff's testimony that she never read the Definitive Agreement before she signed it and her testimony that she would have signed any agreement that her mother had asked her to sign. D.I. 77A, Ex. G at 90.

In response to this contention, the Plaintiff asserts, one, that under the law of this Circuit, she does not have the burden of proving her reliance on the Defendants' omissions and misrepresentations and, two, the Plaintiff's testimony only relates to her own reliance and does not detract from her mother's reliance.

 The reliance element of a 10b–5 claim asks not whether a reasonable person would have considered the omitted or truthful information important in his decision whether to enter the transaction in question or not, which is the test for materiality, *see Flynn v. Bass Bros. Enterprises, Inc.*, 744 F.2d 978, 985 (3rd Cir.1984), but rather, whether the individual plaintiff actually would have considered the undisclosed or truthful information important. *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 (2d Cir.1981); Jacobs, *Litigation and Practice Under Rule 10b–5* § 64.01[a] at 3–311.

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court held that when a 10b–5 case is predicated upon an alleged omission, as opposed to a misrepresentation, the reliance element will be presumed from the materiality of the information not disclosed. *Id.* at 153–54, 92

S.Ct. at 1472. Thus, the Plaintiff in such a case is relieved of the initial burden of establishing reliance if he has been successful in establishing materiality. The Third Circuit has held, however, that in cases involving both misrepresentations and omissions, the allocation of the burden of proof should not be set according to an inflexible rule but rather should be set according to a determination of where it more appropriately lies. *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 188 (3rd Cir. 1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *see also Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 208 (3rd Cir.1990); *Zlotnick v. TIE Communications*, 836 F.2d 818, 821–822 (3rd Cir.1988). "We conclude that the proper approach to the problem of reliance is to analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance." *Sharp*, 649 F.2d at 188 (citations omitted). "We therefore, presume reliance only 'where it is logical' to do so.'" *Id.*

In the present case, as was discussed above, the Plaintiff has alleged both omissions and misrepresentations with respect to the sale of her MSI stock in 1982. The Court should therefore presume reliance only if it is logical to do so.

 Here, because there is an affirmative statement by the Plaintiff that she did not rely on the Defendants' alleged misrepresentations and omissions, it is not logical for the Court to presume reliance. The lack of reliance is abundantly clear from the Plaintiff's deposition testimony.

QUESTION: Well, did you understand, at the time you were signing [the Definitive Agreement], that your mother was selling her Murry's stock back to Murry's for the amounts stated in the documents?

PLAINTIFF: I never read the documents, I just—.

QUESTION: Oh, you never read it?

PLAINTIFF: I never read them.

QUESTION: Why was that?

PLAINTIFF: Because it was an act of love that I signed this deal for my mother.

QUESTION: So you are saying, Ms. Helman, then, that you would have signed whatever document your mother asked you to sign?

PLAINTIFF: That's correct.

QUESTION: Is it correct, then that you would have signed the document, even if it had given you less for your stock than it did, if you mother had asked you to?

PLAINTIFF: That's correct.

QUESTION: And so, it is correct, then that no matter what price that was in this document for your own Murry's stock, that you would have signed it if your mother had asked you to?

PLAINTIFF: That's correct.

D.I. 77A, Ex. G at 90–91.

It is clear that in selling her MSI interests the Plaintiff was not relying upon any information provided or not provided by the Defendants. Her decision to sell her MSI stock was "an act of love" and she would have made that decision regardless of what information had been disclosed or not disclosed to her. In the face of such an unequivocal statement negating reliance, it would defy logic for the Court to presume it.

Without the benefit of the presumption of reliance, the Plaintiff has not presented sufficient evidence of her reliance to establish a 10b–5 claim with respect to the sale of her MSI stock in 1982. As is clear from the discussion above, the Defendants have successfully come forward with evidence negating the Plaintiff's reliance.

Although Defendants have successfully demonstrated a lack of reliance with respect to the Plaintiff's sale of her MSI interests, they have not been successful in demonstrating such a lack with respect to Sandra Mendelson's sale of her MSI interests. In fact, the Plaintiff has come forward with sufficient evidence of reliance on Sandra Mendelson's part. Sandra Mendelson's lawyer, Melvin J. Sykes, testified that both he and Ms. Mendelson had relied upon MSI's representation that the 1981 financial information which had not been provided to them was not substantially different from the financial information with which they had been provided.

QUESTION: Did you discuss with Sandra Mendelson this possibility, namely, if certain information that you felt you would like to have or were entitled to or whatever was not forthcoming, that she should consider saying I'm not going to make a deal with you until you give me backup financial information?

MR. SYKES: The problem with a company like this, the answer is no, and the problem with a company like this is that you are ultimately going to have to depend upon what they say.

These—let me see here. The financial information of a company of this kind is generally close to the vest, and even if you get it, you have to believe it. If they told us that it was—that the information that we got was substantially reflective of the current situation, that there hasn't been any material change, then this seemed to me to be the only thing we could do.

D.I. 80A, Ex. 4 at 81.

The establishment of the reliance element in Sandra Mendelson's claim also establishes that but for the statute of limitations, Sandra Mendelson would have survived summary judgment on her 10b–5 claim. Because the 10b–5 statute of limitation is not applicable to the securities fraud claim as a predicate act in the context of the RICO claim, *see Agency Holding Corp. v. Malley–Duff & Associates,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), the Plaintiff has presented sufficient evidence of the RICO predicate act of securities fraud with respect to Sandra Mendelson's 1892 sale of her MSI interests.

Equally true is that the Plaintiff's failure to establish reliance with respect to her own 10b–5 claim in connection with the 1982 sale of her MSI interests precludes inclusion of the claim as a predicate act in her RICO claim. *Nutis v. Penn Merchandising Corp.,* 610 F.Supp. 1573, 1583 (E.D. Pa.1985), *aff'd,* 791 F.2d 919 (3rd Cir.1986) (Finding that because the plaintiff failed to allege a 10b–5 cause of action, the plaintiff

also failed to allege the predicate act of securities fraud.); *Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482, 1499 (D.Del.1984) (same).

### b. *The Second Closing*

In her complaint, the Plaintiff asserts a number of alleged omissions and misrepresentation made by Defendants during the renegotiation of the agreement at the second closing.

 As discussed in the statute of limitations section, the purchase and sale of the securities in this case took place on November 30, 1982, when the parties entered the binding agreement to consummate the transaction.[12] Any alleged misrepresentations or omissions occurring after that date therefore were not "in connection with the purchase or sale of securities" and cannot be the basis for a 10b-5 cause of action. *See generally Radiation Dynamics*, 464 F.2d at 876; *Goodman*, 582 F.2d at 388; *Hill II*, 655 F.Supp. at 631.

 In addition, the Defendants' alleged failure to disclose the full details of its proposed transaction with Rymer during the negotiations leading up to the second closing was not a material omission. The standard for determining materiality is whether there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Incorporated*, 485 U.S. 224, 108 S.Ct. 978 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *In re Gen. Motors Class E Stock Buyout Sec. Lit.*, 694 F.Supp. 1119, 1127 (D.Del.1988). An assumption underlying this standard is that the undisclosed information could have been used by the plaintiff in the decision to buy or sell the security in question. *Securities and Exchange Com'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2nd Cir. 1968), *cert. denied sub nom., Coates v. S.E.C.*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). In the present case,

the Plaintiff's decision to sell her MSI interests was made in 1982 when she signed the Definitive Agreement. The alleged omissions surrounding the second closing were made significantly thereafter. Because the alleged omissions did not relate to the Plaintiff's sale of her MSI interests, they were not material for 10b-5 purposes.

 Finally, the Plaintiff's 10b-5 claim must fail because she did not rely on the Defendants' alleged omissions. As stated above, the Plaintiff in some circumstances may be initially relieved of the burden of affirmatively proving reliance because reliance may be presumed from the materiality of the alleged omissions or misrepresentations. *Affiliated Ute Citizens v. United States*, 406 U.S. at 156, 92 S.Ct. at 1473; *Sharp v. Coopers & Lybrand*, 649 F.2d at 188.

Because the Plaintiff failed to establish the materiality of the Defendants' omission, under no circumstances is she entitled to the presumption of reliance. Nor has the Plaintiff affirmatively presented any evidence of her reliance. The Defendants, however, have presented evidence that the Plaintiff did not rely on the alleged omission.

Evidence that a plaintiff has knowledge of the facts that were allegedly omitted by the defendant will defeat a claim that the plaintiff relied on the omission. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir.1985) ("If the investor already possess information sufficient to call the representation into question, he cannot claim later that he relied on or was deceived by the lie.... If the investor knows enough so that the lie or omission still leaves him cognizant of the risk, then there is no liability."); *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 596 (3rd Cir.1976).

In the present case, the gravamen of the Plaintiff's complaint concerning the second closing focuses on the Defendants' failure to fully inform her of the sale of MSI to

---

**12.** Plaintiff belatedly argues that the 1982 Definitive Agreement was unenforceable because it was an improper restriction on the rights of a shareholder to sell his or her stock. The Plaintiff's argument is without merit.

Rymer. The record is replete with evidence that the Plaintiff and her attorneys were aware of the proposed transaction prior to the commencement of the second closing. Very early in their discussions concerning the second closing, MSI's attorney, Richard Meyer, informed the Plaintiff's attorney, Maurice Rhinehardt, that MSI was engaged in negotiations to sell the company. D.I. 77A, Ex. S at 55–56 ("In a very early conversation, I believe the very first conversation between Mr. Meyer and I, he indicated to me that there were some negotiations going on to sell the company.") Rhinehardt's testimony also indicates that the Plaintiff herself was aware that MSI was in the process of being sold. Rhinehardt characterized the Plaintiff's knowledge as follows: "Well, it would have been more than that, 'they're trying to hold me to the sale of these shares of stock at some very low price compared to what they're making a deal to sell it for. I just know they are. I don't know what the price is, but I know they're doing it.'" *Id.* at 88–89.

That the Plaintiff and her attorney were aware of the facts they assert to have been withheld from them defeats the Plaintiff's claim that she relied upon the omissions. The failure to establish reliance preludes the success of the Plaintiff's 10b–5 claim in connection with the second closing.

It is clear then that the only securities fraud cause of action that would survive summary judgment is Sandra Mendelson's claim regarding the 1982 Definitive Agreement. It is, therefore, equally true that Sandra Mendelson's 1982 claim is the only predicate act of securities fraud.

(ii) Mail and Wire Fraud Predicate Acts

It should be noted that with respect to the allegations of mail and wire fraud, the Plaintiff has failed to plead the specific facts surrounding such mail and wire fraud in the Complaint. In fact, the only reference in the Complaint to any mailings or telephone calls at all appears in a conclusory statement made in the RICO allegation.[13] In addition, in her brief in opposition to summary judgment, Plaintiff has failed to point to any specific facts in the record to support the mail and wire fraud claims stating only that summary judgment is not appropriate because "plaintiff intends to show repeated instances of … mail and wire fraud over a period of several years." D.I. 80 at 60.

In its independent review of the record, the Court has found evidence of four letters and at least six telephone calls. There is one letter to Saul Schwartzbach, Sandra Mendelson's lawyer, from Richard Meyer, MSI's counsel, dated November 18, 1981, in which Meyer transmits to Schwartzbach copies of the 1982 Letter of Intent from which the Definitive Agreement was derived. Another letter dated July 23, 1985, is from Ira Mendelson to the Plaintiff notifying her that MSI was exercising its option to call for the second closing. The other two letters, from Meyer to either the Plaintiff or her counsel, relate the formalities of the second closing. The telephone calls, between Maurice Rhinehardt, Plaintiff's counsel, and Richard Meyer also relate to the second closing.

A violation of the federal mail fraud statute, 18 U.S.C. § 1341, requires a scheme to defraud, participation by the defendant in the scheme with specific intent to defraud and the mailing of a letter in furtherance of the scheme. *U.S. v. Burks,* 867 F.2d 795, 797 (3rd Cir.1989); *Cemar, Inc. v. Nissan Motor Corp. in U.S.A.,* 678 F.Supp. 1091, 1105 (D.Del.1988). The specific intent element may be found from a material misstatement of fact made with reckless disregard for the truth. *In Re Phillips Petroleum Securities Litigation,* 881 F.2d 1236, 1249 (3rd Cir.1989). Similarly, a violation of the wire fraud statute, 18 U.S.C. § 1343, requires a scheme to defraud, specific intent and an interstate wire transmission in furtherance of the scheme. *Cemar, Inc.,* 678 F.Supp. at 1105.

13. The Second Amended Complaint states: "69. Specific acts involving the use of the United States Mails and interstate telephone communications include numerous written correspondence and telephone communications between the parties and their representatives during which the true value of MSI was concealed from the plaintiff."

In the present case, the Plaintiff has presented evidence of only one alleged fraudulent scheme, namely, the MSI Defendants' scheme to purchase Sandra Mendelson's MSI interests for less than their true value. Only mailings and wire transmissions in furtherance of this scheme constitute predicate acts for the purposes of the Plaintiff's RICO claims. The only mailing in furtherance of this scheme about which the Plaintiff has presented evidence is the November 18, 1981, letter from Meyer to Rhinehardt transmitting the draft of the Letter of Intent. The other mailings and wire transmissions were not in furtherance of the scheme to defraud Sandra Mendelson. They were all directed at the Plaintiff and, as the Court has already determined, there was no fraudulent scheme directed towards the Plaintiff.

It is clear then, that the Plaintiff has been successful in establishing the existence of two predicate acts under the RICO statute, namely, the securities fraud predicate act with respect to Sandra Mendelson's 1982 sale of her MSI stock and the 1981 mailing in furtherance of that scheme. Because a successful RICO claim requires the existence of at least two predicate acts, summary judgment in favor of the Defendants on the basis of a failure to establish the existence of the requisite number of predicate acts is inappropriate.

### (b) Defendant Rymer

The Complaint alleges that Defendant Rymer conspired with the MSI Defendants to violate the RICO statue in violation of 18 U.S.C. § 1962(d). In order to establish a successful claim under section 1962(d), the plaintiff must show that the defendant entered into an agreement to commit the predicate acts of the substantive RICO claims and that he did so with knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b) or (c). *Rose v. Bartle*, 871 F.2d 331, 366 (3rd Cir.1989); *Odesser v. Continental Bank*, 676 F.Supp. 1305, 1312 (E.D.Pa. 1987). However, the defendant is not required to agree to commit the predicate acts personally. He is only required to

agree to their commission. *U.S. v. Traitz*, 871 F.2d 368, 396 (3rd Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989).

In the present case, the Plaintiff has not presented sufficient evidence that Defendant Rymer entered into an agreement with the MSI Defendants to commit the predicate acts underlying the RICO cause of action. There could have been no agreement about the 1982 securities fraud predicate act because the evidence presented shows the first contact between Defendant Rymer and the MSI Defendants to have occurred in the autumn of 1984. There is equally no evidence that Defendant Rymer agreed to the commission of the mail fraud predicate act. For this reason, summary judgment shall be granted for Defendant Rymer on the RICO cause of action.

### 2. Pattern of Racketeering Activity

Defendants assert that the alleged predicate acts do not amount to a "pattern of racketeering activity" as envisioned by 18 U.S.C. § 1961(5).

An enormous amount of jurisprudence has developed over recent years with respect to the question of what constitutes a pattern of racketeering activity under the RICO statute. The statute itself is unclear, stating only that a pattern consists of two or more acts of racketeering activity within ten years. 18 U.S.C. § 1961(5). It is quite clear, however, that something more than simply two predicate acts is necessary to establish the existence of a pattern. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

The Supreme Court most recently revisited the issue in *H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In *H.J. Inc.*, the plaintiffs alleged that between 1980 and 1986, Northwestern Bell made various cash and in-kind payments to the Minnesota Public Utilities Commissions ("MPUC") to influence them to approve rates for the company that were unfair and

unreasonable. *Id.* The District Court dismissed the RICO claims because the plaintiff failed to allege a "pattern of racketeering activity." The court found that because "each of the fraudulent acts alleged ... was committed in furtherance of a single scheme to influence the MPUC commissioners", the plaintiff failed to establish the existence of multiple illegal schemes necessary to find a RICO pattern. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 648 F.Supp. 419, 425 (D.Minn.1986). The Court of Appeals for the Eighth Circuit affirmed the dismissal of Plaintiff's RICO claims. 829 F.2d 648 (8th Cir.1987).

In reversing the Eighth Circuit's decision, the Supreme Court stated that the presence of multiple illegal schemes was not a prerequisite to the existence of a pattern of racketeering activity. *H.J. Inc.,* 109 S.Ct. at 2901. The court reasserted that the necessary elements for a pattern of racketeering activity, in addition to two predicate acts within ten years, were relatedness and continuity of the predicate acts. "[The] plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amounted to or pose a threat of continued criminal activity." *Id.* at 2900 (emphasis in original).

### (a) *Relatedness of the Predicate Acts*

In its discussion of the relatedness requirement of the pattern element, the Supreme Court made reference to Title X of the Dangerous Special Offender Sentencing Act, 18 U.S.C. § 3575, *et seq.* That statute provides that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 2901. Relatedness of predicate acts for the purpose of establishing a pattern of racketeering activity under RICO should be measured against this standard. *Id.*

In the present case, it is relatively clear that the predicate acts satisfy the relatedness prong of the pattern analysis. All of the predicate acts were performed by the same persons and were directed towards the same victims with the same purpose. That purpose was to purchase Sandra Mendelson's MSI stock for less than its true value.

### (b) *Continuity of Predicate Acts*

With respect to the continuity prong of the pattern analysis, the Court stated that "continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 2902, *citing, Barticheck v. Fidelity Union Bank/First Nat. State,* 832 F.2d 36, 39 (3rd Cir.1987). A series of racketeering acts can be continuous and therefore a pattern if it either takes place over a substantial period of time or takes place over a short period of time but threatens to continue into the future. *Id.*

The Supreme Court in *H.J. Inc.* envisioned the continuity prong of the pattern analysis as involving a two step inquiry. The first step is to determine whether the racketeering activity alleged involved an open-ended or a closed-ended period. An open-ended period is alleged if there is a threat that the racketeering activity will continue into the future. In attempting to determine whether such a threat exists, the Court suggests that the answer "depends on the specific facts of each case." *Id.*

Without providing any standards for making the determination, the Court gives several examples of open-ended activity that threatens to continue into the future. In one example, the threat of continuity is established by the nature of the predicate acts themselves. Where a hoodlum extorts protection money from neighborhood storekeepers while telling his victims that he intends to reappear from time to time to collect "premiums", the Supreme Court says that "the predicate acts themselves involve a distinct threat of long-term racketeering activity." *Id.* In another example, the Court states that continuity may be established by showing that the predicate acts are part of an ongoing entity's regular way of doing business. *Id.* In any event,

the conclusion that racketeering activity threatens to continue into the future is to be made on a case by case basis. *Id.*

If the determination is made that the racketeering activity alleged involves a series of predicate acts which threaten to continue into the future, then the continuity prong of the pattern analysis is satisfied.

If, however, the conclusion is reached that there is no threat of the racketeering activity continuing into the future, then the second step of the analysis is to determine whether there was a threat of continued racketeering activity over a substantial period of time while the activity persisted. Thus, "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicate acts extending over a substantial period of time." *Id.* at 2902. In the assessment of whether the predicate acts occurred over a substantial period of time, the Court warned "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.*

In the present case, the racketeering activity alleged does not threaten to continue into the future. This case involves a single fraudulent scheme conducted by a small group of perpetrators on a single victim. The object of the alleged scheme was realized when Sandra Mendelson sold her MSI interests for less than their true value. Once the object was realized, there ceased to be a threat that the activity would continue into the future. *See Fiorentino v. Converse,* No. 89–1169, slip op. at 4 (3rd Cir. Aug. 14, 1989) [884 F.2d 1383 (table)]; *Marshall–Silver v. Mendel,* 894 F.2d 593, 597 (3rd Cir.1990).

In addition, the facts alleged by the Plaintiff do not resemble any of the examples described by the Supreme Court in *H.J. Inc.* of racketeering activity that threatens to continue into the future. This case certainly is not analogous to the extortion scheme where the threat of long term criminal activity can be established from the nature of the predicate acts themselves. *H.J. Inc.,* 109 S.Ct. at 2902. Nor is this a case where the predicate acts are alleged to be part of an ongoing entity's regular way of doing business. *Id.*

Having established that the present situation involves racketeering activity which occurred over a closed-ended period of time with no threat of continuing into the future, the Court must next address the operative question of whether the period of time over which the activity took place was substantial enough to be considered a pattern.

In addressing this question, the only guidance the Supreme Court gave was to state that a "few weeks or months" clearly did not satisfy the requirement. *H.J. Inc.,* 109 S.Ct. at 2902. It is not clear from the Supreme Court decision how much longer than a "few weeks or months" the activity must continue be considered a pattern.

The Third Circuit in *Fiorentino v. Converse,* No. 89–1169, slip op. at 4 (3rd Cir. July 21, 1989) [884 F.2d 1383 (table) ], held that racketeering activity occurring over a closed-ended period of "about one year" did not constitute a pattern. Acknowledging that the RICO statute is primarily concerned with long-term criminal activity, the Third Circuit held that a closed-ended period of one year was not considered long term. *Id.*

In *Marshall–Silver,* the Third Circuit held that a closed-ended period of seven months with no threat of continuity into the future was not substantially long enough to be considered a pattern. Finding that "... the predicate acts themselves were concluded in less than seven months", the court held that "[t]his is one of those cases expressly resolved by *H.J. Inc.* when the Court observed: 'Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement: Congress was concerned in RICO with long-term criminal conduct.'" 894 F.2d at 597 (quoting *H.J. Inc.,* 109 S.Ct. at 2901).

In the present situation, the predicate acts took place over a period of, at most, twelve months. The letter transmitting the draft of the Letter of Intent to Sandra

Mendelson was mailed in November of 1981 and the Definitive Agreement was ultimately signed in November of 1982. It would seem from the preceding cases that twelve months of criminal activity with no threat of continuity into the future is simply not substantial enough to be considered long-term criminal activity. Recent authority supports this position. *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F.Supp. 579 (S.D.N.Y.1989) (holding that a closed-ended period of less of thirteen months was not sufficiently long to be considered a pattern); *McCain v. Phoenix Resources, Inc.*, No. 84–CIV–0901, slip op., Kram, J., 1989 WL 146212 (S.D.N.Y. Nov. 17, 1989) (activities occurring over ten months do not satisfy the continuity requirement for a closed-ended pattern); *Fry v. General Motors Corp.*, 728 F.Supp. 455 (E.D.Mich.1989) (closed-ended period of one year and seven months was not sufficiently long enough to be considered a pattern); *Hutchinson v. Wickes*, 726 F.Supp. 1315 (N.D.Ga.1989) (questioning whether a two year closed-ended period is of sufficient length).

Because the activities alleged in the case at bar took place over a period of, at most, twelve months and because there is no threat that this activity will continue into the future, Plaintiff has failed to allege the type of long-term criminal activity necessary to satisfy the continuity prong of the pattern requirement. The failure to allege a pattern of racketeering activity is fatal to the Plaintiff's RICO cause of action.

### 3. RICO Injury Under Section 1962(a)

Defendants argue that the Plaintiff's claim under section 1962(a) of the RICO statute must fail because the Plaintiff did not allege any injury resulting from the "use or investment" in the enterprise of income derived from a pattern or racketeering activity. Plaintiff contends that she is only required to show that her injuries stemmed from the predicate acts underlying the section 1962(a) claim.

Despite the Plaintiff's contentions to the contrary, the Third Circuit requires that when a section 1962(a) violation is alleged,

the plaintiff must establish injury not only from the predicate acts themselves but also from the use or investment of the proceeds of the racketeering activity into the enterprise. *Rose v. Bartle*, 871 F.2d at 367–78 ("Moreover, requiring the allegation of income use or investment injury 'is consistent with both the literal language and the fair import of the language [of section 1962(a)].'" (citations omitted)); *Curley v. Cumberland Farms Dairy, Inc.*, 728 F.Supp. 1123, 1139 (D.N.J.1989) ("... under 1962(a), it is illegal to invest the income of racketeering activity. Therefore, it is not sufficient for the plaintiff merely to show that the alleged injury was caused by the alleged pattern of racketeering activity."); *Uniroyal Goodrich Tire Co. v. Munnis*, No. 89–2690, slip op. at 4, Kahn, J., 1990 WL 45367 (E.D.Pa. Apr. 11, 1990).

In the present case, Plaintiff has not alleged, nor has evidence been presented that in any way demonstrates that the injuries complained of were caused by the use or investment of the fraudulently obtained funds in the enterprise. At most, Plaintiff's injuries stem from the securities fraud and the mail fraud predicate acts. She was not injured by the investment of these fraudulently obtained funds in MSI. For this reason, summary judgment must be granted to the Defendants on the Plaintiff's section 1962(a) claim.

### 4. RICO Injury Under Section 1962(b)

Plaintiff's claim under section 1962(b) fails for the same reason. Section 1962(b) makes it unlawful for any person to acquire or maintain control of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(b). The injury complained of must stem from the acquiring or maintaining control of the enterprise, as well as from the predicate acts. *Leonard v. Shearson Lehman/American Exp. Inc.*, 687 F.Supp. 177, 181 (E.D.Pa.1988).

In the present case, the Plaintiff has not alleged, nor has evidence been produced showing that the Plaintiff's injuries stem from either Murry Mendelson or Ira Mendelson acquiring or maintaining control of MSI through a pattern of racketeering ac-

tivity. Again, at most the Plaintiff alleges injury stemming from the predicate acts themselves.

5. The Section 1962(d) Claim

In order for the Plaintiff to survive summary judgment on her section 1962(d) RICO conspiracy claim, she must come forward with sufficient evidence that the Defendants entered into an agreement to commit the predicate acts underlying the RICO claim and that they did so with knowledge that the acts were part of a pattern of racketeering activity designed to violate the RICO statute. *Rose v. Bartle*, 871 F.2d at 366; *Odesser v. Continental Bank*, 676 F.Supp. at 1312.

As discussed earlier, the Plaintiff has been unsuccessful in coming forward with sufficient evidence to avoid summary judgment in favor of Defendant Rymer on this issue. In addition, because the officers and directors of a corporation cannot conspire with the corporation, *see McIntyre's Mini Computer v. Creative Synergy Corp.*, 644 F.Supp. 580, 585 (E.D.Mich. 1986); *Yancoski v. E.F. Hutton & Co., Inc.*, 581 F.Supp. 88, 97 (E.D.Pa.1983), the section 1962(d) claim against MSI must also fail. There is, however, sufficient evidence in the record to survive summary judgment on the issue of whether Murry Mendelson and Ira Mendelson entered into an agreement to commit the predicate acts and that they did so with knowledge of the object of the conspiracy. Therefore, had the entire RICO claim not been disposed of on the pattern ground, Defendant Rymer's and Defendant MSI's motions for summary judgment on the section 1962(d) claim would be granted on this ground and Defendant Murry Mendelson's and Defendant Ira Mendelson's motion would not be granted on this ground.

D. *State Law Claims*

In addition to the 10b–5 claims and the RICO claims, the Plaintiff raises a number of state law claims in connection with both the Definitive Agreement and the second closing. Having disposed of the federal claims on summary judgment, this Court declines to exercise pendant jurisdiction over the remaining state law claims. *Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The state law claims are therefore dismissed.

### III. CONCLUSION

With respect to the Plaintiff's 10b–5 claims, the Court finds that summary judgment is appropriate in favor of all Defendants because of the applicable statute of limitations. With respect to the Plaintiff's RICO claims, the Court finds that summary judgment is appropriate for all Defendants because the Plaintiff failed, among other things, to establish the existence of a pattern of racketeering activity. The balance of Plaintiff's claims are dismissed for lack of subject matter jurisdiction.